IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
AT BLUEFIELD

ROBERT SAMOSKY, et al.,

    **Plaintiffs,**

v.                                        CIVIL ACTION NO. 1:10-01081

UNITED PARCEL SERVICE, et al.,

    **Defendants.**


<u>MEMORANDUM OPINION AND ORDER</u>

By Judgment Order entered on March 29, 2013, the court GRANTED the motion for summary judgment filed by defendant Chauffeurs, Teamsters and Helpers Local Union No. 175 ("Local Union No. 175" or "Local 175"), GRANTED the motion for summary judgment filed by defendant International Brotherhood of Teamsters, AFL-CIO ("IBT" or "International Union"), and GRANTED the motion for summary judgment filed by defendants United Parcel Service, Sharpe, and Schau (collectively "the UPS defendants"). (Doc. # 97). The reasons for that decision follow.

<u>I. Background</u>

Plaintiffs are current and former drivers for the United Parcel Service ("UPS"), based out of its Business Center in Bluefield, West Virginia. The Bluefield Business Center is part of the Mid Atlantic District and is responsible for the processing of packages and their pickup and delivery to customers

1

within the geographic area serviced by the Center.  From 2009 until May 2011, Paul Schau was the Business Manager of the Bluefield Center.  <u>See</u> Deposition of Paul Schau, May 30, 2012, at 9-10, 60 (hereinafter "Schau Depo. at ___").  Schau was also, at the time, the Manager of the Business Center in Beckley, West Virginia.  <u>See</u> <u>id.</u> at 9, 60.  In May 2011, while retaining the Beckley Center, he was reassigned from the Bluefield Center and picked up management of the Business Center in Lewisburg, West Virginia.  <u>See</u> <u>id.</u> at 10.  Also working at the Bluefield Center was Michael Sharpe, who worked as a supervisor at the Bluefield Center until June 14, 2011, when he was reassigned to the Beckley Center.  <u>See</u> Deposition of Michael D. Sharpe II, May 25, 2012, at 12, 69 (hereinafter "Sharpe Dep. at ___"), Schau Depo. at 10; Deposition of James Austin, Oct. 27, 2011, at 102 ("Austin Depo. Vol. I, at ___").

Plaintiffs are among 35 bargaining unit employees represented by Local Union No. 175.  <u>See</u> Declaration of Ken Hall, August 14, 2012, at ¶ 1 (hereinafter "Hall Decl. at ___").  The terms and conditions of plaintiffs' employment with UPS is governed by a collective bargaining agreement known as the National Master United Parcel Service Agreement ("Master Agreement") and the Atlantic Area Supplement (collectively "CBA" or "Labor Agreement").  <u>See</u> Hall Decl. at ¶ 3; Joint Exhibit 1. Plaintiffs have acknowledged their understanding that the CBA

2

governs the terms and conditions of their employment with UPS.
See Deposition of Robert Samosky, October 11, 2011, at 17-18
(hereinafter "Samosky Depo., at _____"); Deposition of Greg Neely,
August 16, 2011, at 9-10 (hereinafter "Neely Depo. (Vol. I), at
___"); Deposition of Tony Booth, October 14, 2011, at 64
(hereinafter "Booth Depo. (Vol. I), at ___"); Austin Depo. (Vol.
I), at 89.

Local unions, including Local Union No. 175, generally
designate Shop Stewards to assist with their representation of
the bargaining unit employees. See Deposition of Johnny Sawyer,
May 11, 2012, at 26 (hereinafter "Sawyer Depo. (Vol. I), at
___"). At the Bluefield Center, Plaintiff Austin was the Shop
Steward. See id. at 188. He reported to Johnny Sawyer, who was
the Local 175 Business Agent. See id. at 14, 19-20. Sawyer, in
turn, reported to Ken Hall, who is the President of Local 175 as
well as an officer of the International Brotherhood of Teamsters,
serving as head of its Package Division. See id. at 17; Hall
Decl. at ¶¶ 1, 2, and 12.

Article 49 of the CBA provides as follows regarding the
filing of employee grievances:

> A grievance is hereby jointly defined to be any
> controversy, complaint, misunderstanding or dispute
> arising as to interpretation, application or observance
> of any of the provisions of this Agreement.

> Grievance procedures may be invoked only by authorized
> Union representatives. In the event of a grievance, it
> shall be handled in the following manner:

3

(a) The employee shall report it to his shop steward in writing within five (5) working days.  The steward shall attempt to adjust the matter with the supervisor within forty-eight (48) hours.  Management will sign and date each grievance that is presented to them, provided this does not interrupt the operations, regardless of the merits of said grievance.  The purpose of the signature is only to verify that the grievance was actually received.

(b) Failing to agree, the shop steward shall promptly report the matter to the Union which shall submit it in writing and attempt to adjust the same with the Employer within five (5) days.

(c) If the parties fail to reach a decision or agree upon a settlement in the matter, it shall be submitted in writing within ten (10) working days unless otherwise mutually agreed to the Atlantic Area Parcel Grievance Committee.

Joint Exhibit 1, at p. 187.

Regarding Local 175's actual practices with respect to the processing of grievances, Ken Hall testified:

9.   From my experience as a Local 175 agent who spent years processing local grievances, and based upon my familiarity with the manner in which grievances are processed by other local unions under the Atlantic Area Supplement, I can attest to the fact that the parties habitually and by mutual consent waive the five (5) day resolution period for grievances that do not involve discharges, suspensions or other situations in which employees are not being deprived of the opportunity to work.  This accommodation recognizes the significant number of grievances that are filed in some UPS facilities, the vast number of UPS locations that are serviced by a single union agent or company manager, variables including distances and weather, and the other demands on the time of the union and company agents responsible for resolving industrial disputes. The practice in most local unions with which I am familiar is that meetings to process grievances that do not involve discharges or suspensions at the second step are scheduled periodically, when a number of grievances have accumulated.  This permits both

4

> management and union officials to work through multiple
> grievances efficiently.
>
>      10.   Despite this common practice, the contract
> contains a short timeframe for addressing grievances to
> compel resolution of such claims where an employee is
> taken out of work for some alleged violation or where
> an employee is accused of having committed a serious
> breach that the company deems requires immediate
> discipline.

Hall Decl. at ¶¶ 9, 10.

The Complaint, insofar as it relates to the UPS defendants,

alleges as follows:

>      7.   On multiple occasions, Defendants, Paul Schau and
>           Michael "Mike" Sharpe, have engaged in, promoted,
>           condoned, or threatened work place harassment and
>           physical violence against your Plaintiffs herein. . .

Amended Complaint, ¶ 7.  Specifically, plaintiffs allege that

Sharpe committed battery on plaintiffs Austin and Booth and

assaulted plaintiff Samosky.  See id. at ¶ 7(a).  Plaintiffs

further contend that Sharpe "has harassed and threatened each of

the Plaintiffs by screaming or yelling at them, utilizing

improper language, and going to residences of sick employees and

attempted, in a threatening way, to compel them to return to

work."  Id. at ¶7(b).  They also allege that Sharpe has

intimidated and threatened employees for filing grievances and

instructed employees "not to fill in blanks on certain forms so

that the forms could be back dated."  Id. at ¶ 7(c).

As to Schau, the complaint alleges that Schau was aware of

Sharpe's misconduct but refused to take corrective action.  See

id. at ¶ 7(d).  According to the complaint, Schau not only
acquiesced in Sharpe's misconduct, but he also made threats to
employees who attempted to file grievances and had, at times for
various reasons, threatened to discharge plaintiffs.  See id. at
¶¶ 7(d) and (e).  The complaint further alleges that UPS has done
nothing to stop the misconduct of Sharpe and Schau.  See id. at
¶¶ 8 and 9.

        According to plaintiffs,

            The intentional acts of Defendants UPS, Sharpe,
        and Shau, have substantially interfered with the rights
        and abilities of the Plaintiffs, the Defendant Local
        Union, the Defendant National Union, and/or others to
        pursue grievances and other means of dispute resolution
        provided in the [Labor Agreement].  Specifically, Defendants UPS,
        Sharpe, and Shau have engaged in threats, intimidation, and
        coercion: [1] by physically assaulting or battering one or more
        Plaintiffs or others, [2] by threatening to cause the Plaintiffs
        or others to lose their employment with Defendant UPS, and [3] by
        refusing to process and resolve grievances, and this conduct has
        caused the Plaintiffs, the Defendant Local Union, the Defendant
        National Union and/or others to not pursue filing grievances and
        other dispute resolution provided in the contracts referred to
        above.  Defendants UPS, Sharpe, and Shau, have intentionally
        acted to defeat the express provisions in the contracts
        establishing how grievances, once filed, are to be timely and
        substantively resolved so that the Plaintiffs and others receive
        the due process afforded to them under the contracts and by law.
        Those Defendants refuse to comply with the procedures in the
        contracts for the filing and disposition of grievances.

Amended Complaint ¶ 11.  As to the Union defendants, plaintiffs
claim Local 175 has breached its duty of fair representation by
failing to file grievances, failing to prosecute grievances once
they are filed, and/or failing to process grievances in a timely
manner.  See id. at ¶¶ 16-22.

The specific allegations and facts as they relate to each plaintiff are described more fully below.

A. *Plaintiff Robert Samosky*

Samosky has been a UPS employee since May 30, 1990.  <u>See</u> Deposition of Robert Samosky, October 11, 2011, at 9, 11 (hereinafter "Samosky Depo., at ____").  Samosky has never been discharged or suspended.  <u>See</u> <u>id.</u> at 21.  He has never received a warning letter or been disciplined in any way.  <u>See</u> <u>id.</u> at 21, 24, 28-29.  He receives regular pay increases and, at the time of his deposition, was making over $31 an hour.  <u>See</u> <u>id.</u> at 18-19, 53.  He testified that he likes UPS and that "until lately" he was treated fairly.  <u>See</u> <u>id.</u> at 20.

Samosky did not file any grievance under the Labor Agreement in 2008, in 2009, or in 2010.  <u>See</u> <u>id.</u> at 29-30.  In 2010, he "attempted to file a grievance" when, as he put it, "I had the issue with Mike Sharpe for workplace violence."  <u>Id.</u> at 30-31. This relates to an incident between Samosky and Sharpe in which Samosky claimed that, on April 28, 2010, Sharpe became angry when told by Samosky that he was taking his lunch and would most likely miss deliveries.  <u>See</u> Declaration of Kevin S. Phillips, August 22, 2012, and Exhibits B and C thereto.  At the time, Sharpe was working on a computer doing the route and package dispatch for the Center.  <u>See</u> Samosky Depo., at 79-81.  According to Samosky, he told Sharpe "that my route was loaded too heavy

7

and that I was going to have missed packages and that I was going
to sit down in the middle of the day, that I'd been skipping my
lunch, but that I was going to sit down and take my entire
lunch." Id. at 80.  Samosky claims that this upset Sharpe and
caused Sharpe to attempt to lift the computer on which he was
working and try to throw it at Samosky.  See id. at 79-81, 145-
46.  According to Samosky, Sharpe appeared angry, was shaking,
and slammed the computer on the desk and stormed into an office.
See id. at 145-46.

Samosky wanted to file a grievance over the incident but
claims that he did not file one because of Schau's purported
statement to him that this was a private and not a union matter.
See id. at 31-32, 55.  As to his decision not to file a
grievance, Samosky testified:

> Q: Did you ever file a grievance regarding under [sic] the
> labor agreement regarding that incident?
>
> A: No, I did not.  Like I said, Paul told me it wasn't a
> union matter, it was a private matter and I knew that I
> wasn't going to be able to file one and it wouldn't do
> any good anyway and I contacted Mr. Veneri.
>
> Q: Did you ask the union if you could file a grievance
> over this incident in 2010?
>
> A: No, I did not ask them.
>
> Q: You didn't talk to anybody from the union about filing
> a grievance?
>
> A: I talked to Jim [Austin] and I told Jim that I would
> file a grievance.
>
> Q: Okay.  Did Jim prevent you from filing a grievance?

8

A:     No, he said that you needed to file a grievance.  And
       like I said, we - - Jim stated to Paul that he was
       going to give me a form and I would fill it out and
       we'd turn it in and that's when Paul said this is a
       private matter, not a union matter.

                              *  *  *

Q:     Now you talked to Mr. Austin about - - did you talk to
       Mr. Austin about the possibility of filing a grievance
       regarding this incident in 2010 with Mr. Duffy - -

A:     Yes.

Q:     - - Mr. Sharpe?  And what did Mr. Austin say to you?

A:     He said that I needed to file a grievance.

Q:     But you didn't file a grievance?

A:     No.  Like I said, I talked to Paul and he told me it
       was a private matter, not a union matter, so I figured
       there was no use in me filing one.

Q:     But you could have filed one?  Notwithstanding what Mr.
       Schau said to you, you could have filed a grievance
       under the labor agreement, couldn't you?

A:     I could have filed it and probably would have been
       harassed and had extra work put on my truck and they
       were talking and saying Jim was soliciting grievances,
       so Jim was retaliated against too when people filed
       grievances.

Samosky Depo., at 31-33.  Samosky further stated:

Q:     And I take it you concluded, and correct me if I'm
       wrong, that you had contacted an attorney and you
       thought you would get either faster or better relief
       proceeding with your attorney rather than the grievance
       procedure?

A:     I felt like I would have no representation with the
       grievance procedure.

Q:     And that you would get a better result proceeding with
       your attorney?

9

A:   Yes, I felt like I would get a better result.
Id. at 188.  Samosky, however, admitted that Austin told him that
he should file a grievance.  See id. at 30-32, 101-02.  The
incident was investigated by UPS.  See id. at 82-83; Phillips
Decl. and Exhibits B and C thereto.  UPS ultimately concluded
that the incident was dispatch-related and that Sharpe was not
intending to intimidate Samosky.  See Phillips Decl. and Exhibits
B and C thereto.

In 2011, after the lawsuit was filed, Samosky filed two
grievances under the Labor Agreement.  See Joint Exhibit 3.
Grievance No. 8385, filed on April 4, 2011, involved a claim by
Samosky that UPS violated Article 37, Section 1 of the Labor
Agreement by failing to adjust his delivery load for his weight
and physical condition.  See Samosky Depo., at 93-95.  Samosky
admitted that Schau settled the issue with him.  See id.

In the second grievance, Grievance No. 8377, filed on April
8, 2011, Samosky claimed that UPS violated Article 37, Section 1
of the Labor Agreement by not posting the 9.5 opt-in or opt-out
list at the Bluefield Center.  See Samosky Depo., at 88-89.  This
list contains the names of Package Car Drivers who wish to work
more than three 9.5 hour shifts in one work week and the names of
those who do not wish to work three or more 9.5 hour shifts in
one work week.  See id. at 89-90.  According to Samosky, the
Labor Agreement provides that the list should be posted at the

10

Center, but that it was not posted and employees could not sign it.  See id. at 88-92.  Samosky admitted, however, that he was permitted to be placed on the opt-out list regardless of whether the list was posted.  See id.  He also admitted that Sawyer had informed him that he (Sawyer) was on the "nine five committee and that they had agreed to not post the list, . . . if you wanted to be on the list [and] that if they worked you over nine five three times in a five day period that you could take and file a grievance and then you'd be on the nine five list . . . ."  Id. at 90.

As to the representation provided by the Union Defendants, Samosky admitted that Austin is a good Shop Steward.  See Samosky Depo., at 35-36.  He also admitted that he has no complaint about Local 175 President Hall and that Hall has never discriminated against him, acted towards or treated him in bad faith, or been arbitrary with him.  See id. at 36-37.  Samosky also admitted that Sawyer has not discriminated against him or been hostile towards him or treated him in bad faith.  See id. at 37-39.

Samosky's only complaint involving Sawyer's representation stems from the alleged altercation that Samosky had with Sharpe, even though Samosky admitted he did not file a grievance.  See id. at 39.  According to Samosky, Sawyer "did not come down and he did not try to help in any way, shape or form and he knew about it."  Id. at 39.  Samosky claimed that Sawyer "doesn't

11

represent us and he leaves us down here and we do not get grievances heard.  We're stuck down here with people retaliating, giving you more work . . . ."  Id. at 39.  But Samosky admitted that he had not filed a grievance in 2008, in 2009, or in 2010 for Sawyer to represent him.  See id. at 40.  Conceding this point, Samosky testified:

> Q:  Mr. Sawyer has not failed to represent you because you haven't filed a grievance in those three years; isn't that correct?
>
> A:  He's not failed to represent me, no.

Samosky Depo., at 40.

Samosky also admitted that he has never complained to Hall or anyone else in the Teamsters organization about Sawyer.  See id. at 40, 139.  Samosky further stated that there have been no instances where the Union has failed to file, process, or dispose of a grievance on his behalf.  See id. at 41-42.  He admitted that "[a]s to the four times that [he] personally invoked the grievance procedure, [he] got two resolved to [his] satisfaction and two in which [he] got written resolution."  Id. at 191.

In his deposition testimony, Samosky detailed several items which he believes support his claim for relief.  First, Samosky claims that on four to five occasions Sharpe threatened to discipline him when he missed a package delivery to a business before it closed -- though Samosky readily acknowledged that it was his job to deliver packages.  See id. at 21-24.  He also

12

claims that he was threatened with disciplinary action for failing to call the Business Center on days of inclement weather and report the missed delivery of packages to his supervisor, as is UPS procedure.  See id. at 25-26.  Samosky considered it harassment to be asked to call the Center during inclement weather conditions because he does "not have a phone accessible all the time, that I only have signal in two areas and they tell me that if I don't call that I'm going to receive a warning letter"  Id. at 52-53.  Samosky admitted that he has never received a warning letter for failing to call the Center during inclement weather and admitted that he has never filed a grievance over UPS's policy in this regard or over any other threats of discipline.  See id. at 30.

Second, Samosky objected to the volume of deliveries on his route and stated that there was a period in 2009 and 2010 where he was skipping his lunch almost everyday.  See id. at 50-51, 67-68, 80.  Samosky admitted, however, that he never filed a grievance about the situation.  See id. at 51, 67-68.

Third, Samosky claims that he had to urinate in a bottle during his delivery route due to the workload but admitted that he has never filed a grievance, nor has he been instructed by UPS management that such a practice is required or acceptable.  See id. at 85-86, 164.

13

*B. Plaintiff Greg Neely*

Neely has been a UPS employee since November 2002 and became a Package Car Driver in January 2007.  <u>See</u> Deposition of Greg Neely, August 16, 2011, at 6 (hereinafter "Neely Depo. (Vol. I), at ___").  As of the date of his deposition, Neely was still a driver with UPS, making almost $30.90 per hour.  <u>See id.</u> at 10.  Neely has never been discharged and he has never been suspended.  <u>See id.</u> at 19, 21.

He has been issued only one disciplinary action, a warning letter on July 9, 2008, informing him that an accident, on June 30, 2008, in which he was involved while driving a UPS package car was avoidable.  <u>See id.</u> at 19-20, 23; Joint Exhibit 4.  As to that 2008 accident, Neely sustained injuries and was out of work from June 30, 2008 through July 14, 2008.  <u>See</u> Neely Depo. (Vol. I), at 21.  Although Neely did not file a grievance challenging the warning letter, by letter dated July 14, 2008, the Union filed a Protest Letter challenging the discipline.[1]  <u>See id.</u> at

---

[1] Ken Hall explained Local 175's practice in this regard:

Warning letters issued by the company, in contrast, are not considered as significant because the employee is permitted to remain on the job and the letters expire on their own accord nine (9) months after the date of issuance and cannot be considered in subsequent disciplinary proceeding.  (Article 50, Section 7).  Thus, the Union has relatively little incentive to pursue a grievance alleging that a warning letter was issued without cause, since the effect of doing so is to compel the company

14

19; Joint Exhibit 4. However, he did file a grievance, Grievance No. 3324, over not being paid for part of the time that he was out due to injury after the accident and for the subsequent effect on his vacation time allotment. See Neely Depo. (Vol. I), at 62, 67, 122-23; Joint Exhibit 3.

Even though Neely did not file the grievance until August 25, 2009, he claims that the grievance was not resolved in a timely manner. See Neely Depo. (Vol. I), at 127. Neely admitted that, about eight months after the grievance was filed, he attended a meeting regarding the grievance with Austin and Sharpe, and that Austin informed Neely that he needed to provide more documentation regarding the days that he was out in order to correct any pay discrepancy. See Neely Depo. (Vol. I), at 65-67, 122-23, 126, 129. Neely never provided the documentation to Austin or to Sawyer. See id. at 63-64, 128-30, 164; Sawyer Depo. (Vol.I), at 156-58. Neely essentially conceded this grievance stalled because he didn't provide the requested documentation:

> Q:    [T]he first one you filed, from what we can tell, that one never went anywhere because you were supposed to provide documentation that you never provided. Is that a fair statement?

---

to prove that the employee committed a violation. A formal decision of a grievance panel that the warning letter was justified can be used by the company in a subsequent disciplinary proceeding against the employee.

Hall Decl. at ¶ 10.

A:   That's fair.  And one of those reasons is because of
     the time frame it had taken.  I mean, I tried and tried
     and tried, and then they finally heard it and they
     wanted more stuff, and I didn't provide it.  It had
     been long enough.  I assumed it was going nowhere.

Neely Depo. (Vol. I), at 164.

From his perspective, Johnny Sawyer thought Grievance 3324

was settled at the meeting on August 4, 2010.  As he testified:

Q:   Now, it says down here, "Greg will get documentation
     for the days missed."  Right?

A:   Correct.

Q:   Now, that doesn't mean that thing's resolved, does it?

A:   Well, in this particular case, I believe it was.

Q:   Well, why would he get more documentation if it's
     resolved?

A:   That was part of the resolution.  The company has a
     right in the contract to prorate your vacation if you
     miss more than 60 days during the year, non Workers'
     Comp.  Workers' Comp does not count as one of those 60
     days.

          We said, "If you can bring documentation that says
     your absences were related to that Workers' Comp
     injury, they will be deducted from your total days
     missed, and if that gets you below 60, then you're not"
     - - "your vacation won't be prorated.  If you can't
     come up with it, then the contract says your vacation's
     prorated."

          So that was the - - I call it a resolution.  We
     said, if this bears out, and he's able to provide the
     documentation, then he's going to get that vacation put
     back into his bank.

Q:   But my question is: You don't know what he's going to
     produce on August 4, 2010.

A:   No, I don't.

16

> Q:   So if he comes up with more documentation, then there's
>      more to be done on the grievance.  Right?
>
> A:   Well, not really, because Radigan agreed - - there's no
>      disagreement; there's no dispute.  Radigan said, "If he
>      brings that to the company" - - or Rob, whoever we were
>      meeting with, if he provides that to the company, they
>      will deduct it, and if it gets below 60 days, they'll
>      put the vacation back in his bank.  If he can't provide
>      the documentation, then it stays prorated.

Sawyer Depo. (Vol. I), at 156-57.

As to his complaint regarding the timeframe for resolving

his grievance, Neely testified:

> Q:   And your gripe on this one is that it took from August
>      of '09 until approximately April of 2010 before it got
>      heard?
>
> A:   Time period - - yeah, just like the 4035.  It's not
>      being heard in an appropriate time frame.
>
> Q:   What is an appropriate time frame for when grievances
>      are to be heard?
>
> A:   To my knowledge, it's like once it's done, you have
>      five days to file and then 10 days or something it has
>      to be heard.  I'm not exact on the appropriate time
>      frame.  I know it's not eight months.
>
> Q:   How do you know it's not eight months?
>
> A:   I have read the contract book to some extent.
>
> Q:   Are you saying it's in the CBA as far as when the
>      grievance hearings are supposed to be held?

Neely Depo. (Vol. I), at 130-31.

Neely has filed only two other grievances under the Labor

Agreement.  See Joint Ex. 3.  On June 18, 2010, Neeley filed

Grievance No. 3326, requesting to be placed on the nine-five

opt-out list.  See Neely Depo. (Vol. I), at 67, 131-32.  Schau,

17

in response, informed Neely that he did not have the requisite number of shifts over 9.5 hours to be placed on the list.  See Neely Depo. (Vol. I), at 40-41, 132-33.  Nevertheless, Austin and Schau met and discussed the grievance and Neely was added to the list as a result of the meeting.  See id. at 68, 132-35, 185. Neely claims he was not satisfied with the outcome, but the resolution to put him on the list is all that is required under the Labor Agreement.  See id. at 43-44, 68, 162-63.

On October 27, 2010, Neely filed Grievance No. 4035, claiming that UPS violated the Labor Agreement when, on October 22, 2010, supervisors were allegedly performing bargaining unit work.  See Neely Depo. (Vol. I), at 28-32; Deposition of Greg Neely, March 7, 2012, at 270-71 (hereinafter "Neely Depo. (Vol. II), at ___").  Neely claimed that he witnessed part-time supervisors Jeremy Flanigan, Craig Smith, Joe Ball, and Phil Del Grande handling packages.  See Neely Depo. (Vol. I), at 28-32. In the same grievance, Neely also complained about Sharpe handling packages on October 22, 2010 and claimed that he saw Sharpe drive a Package Car to help another driver for three hours while there were four laid off drivers, including Neely, working the pre-load job because there was not enough driver work.  See id. at 47, 137.[2]

---

[2] Specifically, Neely testified:

Q:     So he wasn't driving a package truck, he basically

18

On October 28, 2010, Neely attended a meeting with Austin, Sharpe, and Schau by phone.  Schau told Austin to mark the grievance as unresolved and send it to the next level, which would be to Sawyer.  <u>See</u> <u>id.</u> at 144-45.  According to Neely, Austin claims that he mailed the grievance to Sawyer but Sawyer never received the grievance from Austin.  <u>See</u> <u>id.</u> at 69-70; Sawyer Depo. (Vol. I), at 103, 109-10.  Neely claims that he tried to leave a message for Sawyer regarding the grievance after it had not been processed but did not hear back from Sawyer for a few weeks.  <u>See</u> Neely Depo. (Vol. I), at 31.  Sawyer then contacted Neely and informed him he could not find the grievance form and had no record of the grievance.  <u>See</u> Neely Depo. (Vol. I), at 31.  Although he had a copy of Grievance 4035, Neely did not provide a copy to Sawyer because he "didn't ask for a copy." <u>Id</u>.

Regarding his perceived delay in the processing of Grievance No. 4035, Neely testified:

> Q:   Your amended complaint is stating that the grievances are not processed and heard fast enough.  That's one of the complaints there, correct?

---

> drove a company vehicle to the mall, didn't carry anything in it?
>
> A:   No.  He drove a package car to the mall with packages in it.  I think it had packages in it, I'm pretty sure.

Neely Depo. (Vol. I), at 143.

A:   Yes, sir.

Q:   Are you saying that the grievance that you filed, Exhibit E, on October 27, 2010, should have been heard and resolved by December 15, 2010 when you had filed the amended complaint?

A:   Way before.

Q:   Way before?

A:   Yes, sir.

Neely Depo. (Vol. I), at 151.

Neely testified that Austin is a good Shop Steward and that he has a good relationship with Austin.  *See* Neely Depo. (Vol. I), at 56-57.  He admitted that Austin never refused to take a grievance of his and kept him up to date on the status of the grievances.  *See* *id.* at 57-58, 113.  Neely further testified that Austin has represented him fairly, and has never discriminated against him or acted in bad faith.  *See* *id.* at 57.

Neely's only complaint regarding Ken Hall is that, as Sawyer's supervisor, he should do more to monitor Sawyer's performance as the Business Agent.  *See* *id.* at 58-59.  But, Neely admitted that Sawyer had never been hostile towards him, had never acted in a discriminatory way towards him, and, except for the handling of Grievance No. 4035, admitted that Sawyer has never acted in bad faith towards him.  *See* Neely Depo. (Vol. I), at 70.  Neely has never filed a grievance with Local 175 or otherwise complained to Hall or any other union official about Sawyer's performance as Union business agent.  *See* *id.* at 115.

20

Neely also admitted that neither Sawyer nor Austin ever deprived him of his right to file a grievance.  See id. at 113.  Neely summed up his complaints regarding Local 175 as follows:

> Q:   It seems to me that the general gist of your complaint against Local 175 is that Johnny Sawyer isn't doing a good job.  That's what I'm getting out of this conversation today.  Is that a fair statement?
>
> A:   Yes.  He is not representing us to the best of his ability.

Neely Depo. (Vol. I), at 113.

In his deposition testimony, Neely raised several complaints about Schau and Sharpe's purported insensitivity to him for which he never filed a grievance.  Neely claims that he had an undiagnosed nervous breakdown, that he has Addison's disease, and that he has obsessive compulsive disorder and that, in January 2010, in a discussion with Schau, Schau allegedly told Neely that as long as he had a U.S. Department of Transportation card he "could care less what's wrong with" him.  Id. at 35-37, 103-04. Neely claims this incident constitutes workplace harassment, but he did not file a grievance regarding the exchange.  See id. at 79-81, 84.  Further, Neely complains about an incident in February 2009 when Sharpe, who lives next door to Neely, came to Neely's house when Neely was sick.  See Neely Depo. (Vol. I), at 48-49, 72.  According to Neely, he was still having neck and back pain from the accident of June 30, 2008, and he called in sick to work.  See id. at 72.  Sharpe told Neely that he needed him to

21

work that day if there was any way he could.  See id. at 75.
Neely alleges that Sharpe became agitated at the end of the
conversation and swore in front of Neely's family before he left.
See id.  Neely never filed a grievance regarding this incident.
See id. at 111.

Neely also objects to his work load.  See Neely Depo. (Vol.
I), at 207-09, 226.  To this end, Neely complained that, on some
unspecified occasions, he has not been able to take his lunch
until the end of the day in violation of the Labor Agreement.
See Neely Depo. (Vol. I), at 209.  Neely also complained about
drivers being so busy they were forced to urinate in bottles on
the UPS truck.  See Neely Depo. (Vol. I), at 207-09.  However, he
admits he has never filed a grievance over the issue.  See Neely
Depo. (Vol. II), at 251.

Neely is 17th out of the 19 positions on the seniority list
for Package Car Drivers at the Bluefield Center.  See Neely Depo.
(Vol. I), at 7.  As such, there are many occasions when he is not
working due to lack of work.  See id. at 7-10.  Neely objected
that his hours of vacation were reduced as a result of not
working enough days to receive all of the available vacation time
and that he should be coded as "scheduled off as opposed to laid
off" on these days.  See id. at 12-13, 15-16.  Because he works
less, he is eligible for less vacation time.  Neely acknowledged
that UPS has followed its policy, though he does not like it, and

that he has not filed a grievance regarding the issue.  See id.
at 15-16, 18-19; Neely Depo. (Vol. II), at 247-48.

Neely admitted that he never filed a grievance regarding any
of these items that he complains about regarding his purported
treatment by Schau and Sharpe.  See Neely Depo. (Vol. I), at 111.
Neely also testified that Schau and Sharpe had never been
physically violent towards him.  See Neely Depo. (Vol. I), at 48,
80, 87.

*C. Plaintiff Tony Booth*

Booth was employed by UPS from 1984 until August 31, 2011,
at which time he retired.  See Deposition of Tony Booth, October
14, 2011, at 4-5 (hereinafter "Booth Depo. (Vol. I), _____").
During his employment with UPS, Booth was never discharged nor
suspended by UPS, but he did receive disciplinary letters.  See
id. at 10-11, 35.  One was issued on December 3, 2009 for missing
delivery of a package.  See id. at 36-37.  Another was
issued after the lawsuit was filed and related to an accident
that Booth caused.  See id. at 40-41.  Booth did not file a
grievance over either letter.  See id. at 37, 40.  Booth,
however, acknowledged that on December 3, 2009, Sawyer wrote a
letter to UPS protesting a warning letter Booth received.  See
id. at 34-35.  Sawyer also protested discipline issued to Booth
on August 3, 2010, and January 7, 2011.  See id. at 39-40.  This
is consistent with the Union Defendants' strategy whereby, as

Sawyer explained in detail, the Union files protests on the issuance of any warning letter issued by UPS and files a grievance if the warning might result in time off for the employee. <u>See</u> Deposition of Johnny Sawyer, June 1, 2012, at 281-82, 294-95 (hereinafter "Sawyer Depo. (Vol. II), at ___").[3]

Since 2008, Booth filed several grievances related to non-bargaining unit employees performing bargaining unit work. <u>See</u> Joint Exhibit 3.  On September 4, 2008, Booth filed a grievance alleging that supervisor Gracie Schaffer was performing bargaining unit work.  <u>See</u> Booth Depo. (Vol. I), at 12.  Booth met with Austin and Sharpe regarding his grievance but it was not resolved.  <u>See</u> <u>id.</u> at 12.  Booth believes Austin told him that a meeting had taken place about the issue with Sawyer and UPS, but because Booth was not present, the grievance was "thrown out." <u>See</u> <u>id.</u> at 15.  Johnny Sawyer testified that the Union's decision to dismiss the grievance was not based on Booth's absence but, rather, for other reasons.  <u>See</u> Sawyer Depo. (Vol. II), at 357-58.  As Sawyer explained:

---

[3] Sawyer explained Local 175's strategy: "In discipline cases, where no one's off the job, I'm not the moving party.  I don't move that to any steps, because, in my experience, that discipline, certainly, if the company don't move on it within a reasonable - - I wouldn't let the company come back and say, "Oh, yeah, Austin got suspended a year-and-a-half ago.  We want to talk about that."  We're not talking about that.  That's over . . . . . I do that in every center I represent."  Sawyer Depo. (Vol. II), at 282.

> Q:   Was it also resolved, I think at that grievance
>       meeting, that they would not allow the supervisors to
>       continue working, on another grievance, perhaps?
>
> A:   I believe it was part of – – not – – maybe not a
>       written settlement.  Part of an agreement.  And that
>       may have been the meeting that Rob Eans said, "If you
>       come in as a driver, and you've got a sup working, hop
>       up there and go to work."

Id. at 358.

On March 8, 2011, Booth filed a similar grievance, Grievance No. 8381, regarding another supervisor, Joe Ball, performing bargaining unit work.  See Booth Depo. (Vol. I), at 41.  A grievance meeting was held and the grievance reflects that Sawyer and UPS resolved the issue; however Booth claims that supervisors continued to perform bargaining unit work.  See id. at 41-42. Booth could not recall filing another grievance over this issue with respect to Ball.  See id. at 42.

After the lawsuit was filed, Booth filed several grievances related to his perception that his work load and the amount of deliveries on his route were onerous: Grievance Nos. 4029, 4124, and 4033.  See Joint Exhibit 3.  On August 3, 2010, Booth filed Grievance No. 4029, regarding UPS not taking his age and physical condition into account when assigning delivery routes and requested reduced work on his route.  See Booth Depo. (Vol. I), at 18-19; Joint Exhibit 3.  Booth states that his delivery load was never lightened as a result of filing the grievance.  See id. at 20.  On August 27, 2010, Booth filed a second grievance, No.

4124, regarding this issue.  See id. at 24.  On October 27, 2010,
he filed a third grievance, No. 4033, regarding this issue.  See
id. at 28.  That grievance form reflects that Booth was satisfied
with the progress on the issue, although Booth claimed at his
deposition that he was not satisfied with the progress.  See
Booth Depo. (Vol. I), at 29-30; Joint Exhibit 3.

On March 8, 2011, Booth filed Grievance No. 8382, a
grievance over working more than three 9.5 hour shifts in one
week.  See Booth Depo. (Vol. I), at 43; Joint Exhibit 3.  As a
result, he was placed on the nine-five opt-out list.  See Booth
Depo. (Vol. I), at 42-43.

In his deposition, Booth expressed positive views about the
representation by Austin, whom he testified is a good Shop
Steward.  See id. at 70.  He further acknowledged his
understanding that Austin, as the Shop Steward, "was the first
step in the grievance procedure."  Id.  Booth does not have any
complaints about Austin, and testified that Austin accepted
Booth's grievances and that he had a good relationship with
Austin.  See id.  Booth also admitted that he has no specific
complaint regarding Local 175 President Hall and that Hall has
never shown any hostility towards him.  See id. at 75.  After the
lawsuit was filed, Booth complained to Hall about alleged
harassment at the Bluefield Center and that nothing was being
done about it.  See id. at 7-8.  Sawyer called Booth the

26

following week to inform him he was working on the situation. See id. at 8-9.

In the late spring or early summer of 2011, well after the lawsuit was filed, Booth claims that he complained to Hall about Sawyer contending that Sawyer was not representing him, that it was taking too long for grievances to be heard, and that Sawyer was not returning his phone calls. See id. at 72. Booth admitted that, prior to the lawsuit, he had never filed an internal union grievance or complained about Sawyer's performance as the Local Union Business Agent, or filed any other grievance with the Union Defendants. See id. at 7. Booth admitted that, despite these post-lawsuit complaints, Sawyer was never hostile towards him, never discriminated against him, and never refused to file a grievance on Booth's behalf. See id. at 73.

At his deposition, Booth raised several complaints about his alleged treatment at UPS over which, he admitted, he never filed a grievance. First, Booth claims that, since January 2008, Sharpe has cursed and yelled at him, but he admitted that he has not filed a grievance regarding any such incidents and cannot name any dates where he specifically recalls Sharpe losing his temper or harassing him. See id. at 93-95. Booth also admitted that he has never made the Union Defendants aware of Sharpe's purported conduct. See id. at 95-96. Second, Booth alleges that Sharpe has threatened to fire him. See id. at 79-80. Here

27

again, Booth admitted that he did not file a grievance or speak to Austin about Schau's alleged threat.  See id. at 86.  Third, Booth alleges that Schau accused Booth of stealing time because Booth was taking so long to deliver packages on his route.  See id. at 86-87.  Booth claims that Schau said "I ought to fire you."  Id. at 88.  Booth was never fired, and he did not complain to UPS, Austin, or the Union Defendants about the incident nor did he file a grievance.  See id. at 88.  Fourth, Booth claims that when Schau or Sharpe would conduct a ride-along wherein they would observe his performance, they would organize the packages on his Package Car so that they were loaded in delivery order and Booth could, therefore, make deliveries faster.  See id. at 90-91.  Booth claims that Schau would then harass him as to why he was not performing up to the same standards when he was not being observed.  See id. at 91.  Again, Booth never filed a grievance regarding this alleged practice.  See id. at 91-92.  Fifth, Booth alleges that Sharpe, sometime in 2010, told him to sign safety-related papers "if he knows what's good for him" without reviewing the procedures outlined in the document.  Id. at 104-06.  Booth did not complain to the Union Defendants regarding this incident nor did he file a grievance.  See id. at 106.  Booth also claims that Sharpe asked him to sign a sheet acknowledging he had watched a hazardous materials video which he had not watched.  See id. at 105.  Booth did not sign the

28

document, he did not contact the Union Defendants regarding either of these incidents, and he does not claim there was any retaliation as a result.  See id. at 105-06.

Finally, Booth alleges that Sharpe physically confronted him during an incident in March, 2010.  See Deposition of Tony Booth, October 27, 2011, at 127, 157 (hereinafter "Booth Depo. (Vol. II), ___").  According to Booth, he and Sharpe were discussing the way packages were loaded on Booth's Package Car.  See id. at 129.  Booth claims that Sharpe yelled at him and was "in [his] face."  Id. at 129-30.  Booth claims that he told Sharpe to step back, and instead of stepping back, Sharpe chest-bumped him.  See id. at 129-30.  Booth claims that Sharpe continued to push Booth until Booth's back was against a shelf.  See id.  Booth did not file a grievance over the incident because, as he put it, "[t]hey wouldn't hear any grievances. It would take forever for them to come and meet on grievances . . ."  Id. at 131.  He also did not report the incident to UPS or to Sawyer.  See Booth Depo. (Vol. I), 52-53, 151.

D. Plaintiff James Austin

Austin has been a UPS employee since 1988 and has been a Package Car Driver since 1993.  See Austin Depo. (Vol. I), at 6-7, 83.  He has never been terminated.  See id. at 11.  He has never been suspended.  See id.  And, as to any warning letters that he received from UPS, Austin admitted that the Union

29

protested them and nothing came of them.  See id. at 11-12.
Austin served as the Shop Steward for Local 175 for a number of
years.  See id. at 5, 68-69.

In addition to serving as Shop Steward and filing grievances
on behalf of other bargaining unit employees, Austin has filed
two grievances on his own behalf.  See Austin Depo. (Vol. I), at
24; Joint Exhibit 3.  On May 7, 2009, Austin filed Grievance No.
3337 claiming that UPS violated the Labor Agreement due to
"excessive number of rides, harassed, eat, safety issues."  Id.
at 13, 197-98; Joint Exhibit 3.  Prior to filing the grievance,
Austin called Sawyer to complain about being subjected to
frequent ride-alongs.  Sawyer addressed the issue directly with
UPS's labor relations personnel, and the supervisor who was
assigned to ride-along with Austin was taken off of the
assignment.  See id. at 15-17, 75-76, 95; Joint Exhibit 3.
Although Austin complained that this grievance was never heard
and no one got with him and said "This has been settled," he
testified

> I think Johnny [Sawyer] called me to see what happened
> and I wanted to know what John had said, because I
> said, "You really pissed them off," and Johnny said,
> "Well, I told them to get the fuck off my steward down
> there."  And I said, "I appreciate it," you know.  And
> so that was the end of that.

Austin Depo. (Vol. I), at 17, 95.

The next grievance filed by Austin, Grievance No. 4024,
alleged that UPS had docked him a vacation day where he should

30

have been docked a personal day.  See id. at 20-24.  Sawyer and
Austin discussed the issue and UPS ultimately agreed to change
its practice in the future.  See id. at 23-24.

According to Austin, Grievance No. 3337 also included a
claim that UPS violated the Labor Agreement as a result of an
incident between himself and Sharpe.  See id. at 103-05).  Austin
alleges that Sharpe "rubbed up" against him.  Id. at 105.
According to Austin:

> A:   [Sharpe] was mad and I had a hand truck full of
>      packages and they were too tall, but anyway we
>      were arguing and I'd said something to set him
>      off, I guess.  He just flies off the handle
>      sometimes.  And he was pointing at me, just, you
>      know, bumped me up into the truck.  He walked me
>      backwards-I'm walking backwards and he bumps me
>      into the truck-
>
> Q:   When you say, "He bumps you," did he physically
>      push you?
>
> A:   He rubbed up against me, you know, that's why I
>      call it a chest bump.

Id. at 104-05.

Austin claims that the "chest bump" portion of the grievance
is still unresolved, though Local 175's position is that the
grievance in its entirety has been resolved.  See id. at 170;
Sawyer Depo. (Vol. I), at 110.  As Johnny Sawyer explained:

> Q:   How about the May 7, May 8, 2009 grievance for Jim
>      Austin?
>
> A:   My opinion, that was resolved.

* * *

31

Q:     Back to this May 2009 grievance of Mr. Austin, 3337, second page of Exhibit - -

A:     Yes.

Q:     - - 2.  Tell me whether you recall processing this grievance.

A:     Do I remember when it came in?

Q:     Yeah, tell me what you did with this grievance, because we know that you guys got it, because it's stamped "May 11, 2009."

A:     Absolutely.

Q:     So what did you do to process - - or resolve, I should say, the grievance?

A:     Well, in my opinion "excessive number of rides," it had already been resolved.  That's the one I made the phone call on when Jim called me, "Pulled the sup off the car."  That's the remedy for this grievance.

Q:     That's the remedy for excessive number of rides, for sure, isn't it?

A:     Yes.  And harassed.

Q:     Well - -

A:     He felt like they were harassing him by continuing to ride with him, as, obviously, did I.

Q:     Well, is it your understanding that the only harassment was them wanting to ride with him?

A:     Yes, that's - - that was our conversation on the phone.

Q:     Did Mr. Austin ever tell you that Mr. Sharpe had assaulted him?

A:     Let me just say this: My relationship with Jim Austin, he has been nothing but a straight-up shooter with me.

32

Q:   Sure.

A:   I assure you, I did not hear him say that on the
     phone call.  I'm not going to sit here and say
     that he's lying about it, he didn't say it.  I can
     assure you I didn't hear him say it.

Q:   Well, you're not saying - - you're not testifying
     under oath today that he didn't tell you.  You're
     just saying you don't remember it?

A:   I'm just - - I completely couldn't have heard it,
     because, believe me, I would have responded to
     that issue before I would have responded to the
     excessive number of rides.

Q:   Well, in point of fact, this grievance also refers
     to safety issues.

A:   (Witness nods affirmatively.)

Q:   Now, man, that's separate from rides and
     harassment.  So what did you do to resolve safety
     issues?

A:   My understanding was, the sole thing was generated
     when they tried to climb back on the car with him.
     And that's - - and, frankly, we had no further
     discussions about this grievance, even Jim and I.
     I understood - - and it's possible I was wrong.  I
     understood that this was about the excessive
     rides, and that was the settlement.  I got him off
     the car, and that was it.

                         *  *  *

Q:   Do you disagree that this form was filled out
     after you made a call to stop the supervisor from
     getting on the car?

A:   I don't know that.  I'm saying I understood 5/7 to
     be the day that it happened.  So the grievance was
     filled out on 5/7.  So when I got this grievance,
     I assumed that this was all about the rides, which
     is what we talked about on the phone, and that's
     why, to me, the issue was resolved.

                            33

Q:    Well, it says "excessive number of rides,
      harassed," and you're saying harassment is just
      the rides, is what you're saying it meant.  Right?

A:    That's what I took it.

Q:    Right.  And if Mr. Austin disagrees with that, I
      mean, you don't remember anything different.  And
      I'm not going to take you to task over it.  I just
      want to be clear.  Right?

A:    (Witness nods affirmatively.)

Q:    Is that "Yes"?

A:    Correct.

Q:    But then there are safety issues out there.  Okay?
      And I want to know how that was resolved if we
      assume that harassment is confined to putting the
      supervisor on the car with him.

A:    For right or wrong, I assumed this grievance was
      generated because of the rides.  Now, if I was
      wrong, it certainly wasn't intentional.  I thought
      that was the only - - that's why he called me that
      morning.  We talked about rides, and I resolved
      that issue.  I thought I resolved that issue.

Sawyer Depo. (Vol. I), at 110-21.

    In his testimony, Austin admitted that Sawyer and Hall have

never been hostile or acted in a discriminatory manner towards

him and that he has never filed any internal formal or informal

complaint against the Union, Sawyer, or Hall.  See id. at 9, 42,

92-94.  Austin claimed that Sawyer can be hard to get in touch

with on occasion, however he admitted that he eventually has been

able to reach him.  See id. at 43-44.  Austin admitted that the

Local Union has challenged warning letters Austin has received

from UPS.  See id. at 11, 29, 39.  Austin's only complaint

appears to be Sawyer's purported failure to resolve Grievance No. 3337 in its entirety as to the chest bump.  Indeed, Austin testified: "

> Q:  Has the local always accommodated you and represented you and your people fairly in negotiations?
>
> A:  I feel like they have, probably.  I mean, I don't know everything that goes on, but yes.

Id. at 10.

For his part as a Shop Steward, Austin handles grievances filed by drivers and sorters at the Bluefield Center.  As he explained:

> Q:  And you understand that the union considers a steward to be the first line of defense, the first representative of the bargaining unit?
>
> A:  I suppose, yes.  I never really thought about it that way, but - -
>
> Q:  When you process a grievance, you are processing it on behalf of the union, right?
>
> A:  Sure, yes.

Id. at 67-68.  Austin testified that he never told any Bluefield Center bargaining unit employee that there was no right to file a grievance, and that he never prevented anybody from filing a grievance.  See id. at 39-40, 75-77.  Austin testified that, as a Shop Steward, he has been honest in his dealings with his fellow Plaintiffs.  See id. at 90.

During his deposition testimony, Austin detailed several items -- all related to production and expectations regarding

35

production -- which he believes supports his claim for relief. Austin admitted, though, that he did not file a grievance under the Labor Agreement regarding any of them.  Austin complained about the workload, including the volume of packages placed on his car.  See id. at 141.  Austin claims that, on one occasion, Sharpe demanded that Austin carry a delivery that was heavier than what Austin believed to be was safe, and Austin claims to have injured his neck due to the size of the load.  See id. at 145.  Austin alleges that both Sharpe and Schau have harassed and threatened him regarding low production and the filing of grievances.  See id. at 100-01.  On one occasion, he claims that Schau cornered him while he was on his route and said: "You need to take more care and worry about your family and not worry about how I'm running the center . . . . You'd better watch your back . . . . Ask around."  Id. at 115.  On another occasion during a morning meeting, Schau purportedly yelled at the drivers -- including Austin - - regarding their low production and threatened to shut the Center down.  Id. at 130.  Again, Austin did not file a grievance over any of these incidents or any alleged safety issues.  See id. at 24-25, 31-34, 72-73, 145-46.

*E. Plaintiff J.C. Blaylock*

J.C. Blaylock has been a UPS employee since 2005 and has worked as a Package Car Driver since 2008.  See Deposition of J.C. Blaylock, October 11, 2011, at 5 (hereinafter "Blaylock

36

Depo. (Vol. 1), at ___"); Deposition of J.C. Blaylock, October 14, 2011, at 6-7 (hereinafter "Blaylock Depo. (Vol. II), at ___").  As of the date of his deposition, Blaylock was still a full-time driver with UPS, making $30.90 per hour.  See Blaylock Depo. (Vol. II), at 8.  During his employment with UPS, Blaylock has received several disciplinary letters but has never been suspended or discharged.  See Blaylock Depo. (Vol. I), at 6-8; Blaylock Depo. (Vol. II), at 61-62.  Blaylock further admitted that the Union sent a letter to UPS on his behalf challenging each of those disciplinary letters.  See Blaylock Depo. (Vol. 1), at 9-10.

From the time Blaylock became employed by UPS until the time he commenced the state court action in this case, Blaylock filed four grievances under the Labor Agreement.

On December 19, 2008, Blaylock filed a grievance requesting his work history to determine if seniority was obtained because, he believed, UPS had incorrectly calculated his seniority date. See Blaylock Depo. (Vol. 1), at 53.  Blaylock claims that, when he filed the grievance regarding his seniority date, Schau yelled at him and asked him if he "wanted to go down that road," and told him that he would have a bull's eye on his back.  Blaylock Depo. (Vol. II), at 33-34, 84-85.  Blaylock admitted, however, that the grievance was settled on or about the same day it was filed.  See Blaylock Depo. (Vol. I), at 53.  Blaylock further

37

testified that he didn't have any problem with the way that grievance was handled by the union.  See id.  The grievance form itself indicates that the grievance was settled because Blaylock's "seniority date was corrected."  Joint Exhibit 3.

On February 24, 2009, Blaylock filed a grievance over a pay discrepancy wherein he alleged UPS had failed to pay him the correct wages.  See Joint Exhibit 3.  According to Blaylock, at the same time he had been underpaid on certain occasions, UPS had overpaid him at other times.  See Blaylock Depo. (Vol. II), at 65.  Blaylock claims that he attempted to report the overpayment issue to UPS but was encouraged not to do so.  See id.; Blaylock Depo. (Vol. 1), at 54-56.  During the grievance hearing, Blaylock claims that he spoke with Sawyer and thought that he would not have to repay the money; however, at the hearing, Blaylock was instructed that he would have to repay the money, which upset him, even though he did in fact owe the money. See Blaylock Depo. (Vol. II), at 65-67.  Blaylock did not sign the grievance form.  See Joint Exhibit 3.

On January 6, 2010, Blaylock filed Grievance No. 4027 complaining that Sharpe allegedly attempted to discharge him for "abandon[ing] his work."  Blaylock Depo. (Vol. I), at 29; Joint Exhibit 3.  According to Blaylock, on December 22, 2009, he was driving his truck when he started feeling ill.  See Blaylock Depo. (Vol. I), at 30; Blaylock Depo. (Vol. II), at 108-09.

Blaylock testified that because of bad weather, he missed a delivery. See Blaylock Depo. (Vol. II), at 108. Blaylock stated that went into a doctor's office to borrow the phone and report the missed delivery to UPS. See id. at 108-09. According to Blaylock, Sharpe became very irate and screamed and yelled at him on the phone. See id. at 109-12. Deciding that he could drive no longer because he started having chest pains, Blaylock told Sharpe that he couldn't finish his shift. See Blaylock Depo. (Vol. I), at 30-31; Blaylock Depo. (Vol. II), at 111-12. UPS came to get Blaylock's truck and Blaylock went home. See Blaylock Depo. (Vol. I), at 31-32. Once relieved, Blaylock claims he went to the hospital and was told to stay out of work until approximately December 28, 2009. See Blaylock Depo. (Vol. II), at 112-13. Blaylock did not return to work until early January 2010. See id. at 116.

According to Blaylock, UPS then sent a letter saying that Blaylock was going to be discharged for being a "no-show" and abandoning his work. See Blaylock Depo. (Vol. I), at 32. According to Blaylock, this amounted to UPS falsification of records because he had in fact called into work. See Blaylock Depo. (Vol. II), at 175-76. Blaylock filed the following grievance:

> I reported an illness on 12-22 + got relieved of my duties for the day. I went to a doctor + obtained an excuse for my illness. Since, Paul Schau + Michael Sharpe have both suggested I abandoned my work.

39

> Michael Sharpe informed Jim Austin that he was going to
> fire me but Paul Schau said to wait until after peak in
> case I was needed to help.  I was told to produce my
> excuses prior to my release date by Paul Schau because
> he thought I may obtain it falsely.  Also, I was put in
> as a no call, no show in the system although I informed
> my supervision staff of the situation.

Joint Exhibit 3.  As to the remedy requested, Blaylock asked "To
no longer be harassed over a proven illness + not feel as if I
fear for my job."  Id.

While Blaylock filed a grievance over the incident, the
union also sent a letter challenging the discharge.  See Blaylock
Depo. (Vol. I), at 32-33.  The grievance was discussed at an
August 4, 2010 grievance meeting with Sawyer present, but still
was unresolved according to Blaylock.  See Blaylock Depo. (Vol.
II), at 128-31.  During the meeting, Sharpe and Schau told him
that he had not followed the call-off procedures.  Sawyer
instructed Blaylock to follow the call-off procedures, which
Blaylock claims he did.  See Blaylock Depo. (Vol. I), at 37-38;
Blaylock Depo. (Vol. II), at 128-31.  Blaylock was never
discharged and he admitted that he was not subjected to
discipline for the incident.  See Blaylock Depo. (Vol. I), at 38-
39.  The grievance form does not state that it was resolved and
it further indicates that "JC wants investigation."  Joint
Exhibit 3.

On January 25, 2010, Blaylock filed Grievance No. 4028
regarding not being paid holiday pay.  See Blaylock Depo. (Vol.

I), at 25-27.  The grievance form indicates that Blaylock

eventually received eight hours of holiday pay although Blaylock

does not specifically remember receiving the payment.  See id. at

25-27; Joint Exhibit 3.  Blaylock conceded that the amount could

have been added to another paycheck and, that, if he actually

received the pay, he had no "problem with the resolution of this

grievance."  See Blaylock Depo. (Vol. I), at 27.  Blaylock

further admitted that he never went to UPS or the Union to

complain that he never got the aforementioned holiday pay.  See

id.  Blaylock essentially testified that he didn't know if he had

a complaint about this grievance or not.  See id. at 28.[4]

_____

        [4] On January 21, 2011, after this lawsuit was filed,
Blaylock filed three additional grievances.  Blaylock filed
Grievance No. 4120 which sought pay for three hours and 29
minutes.  See Blaylock Depo. (Vol. I), at 11; Joint Exhibit 3.
Blaylock complained that Johnny Sawyer should have said more on
his behalf during the grievance meeting, held on February 3,
2011.  See Blaylock Depo. (Vol. I), at 23-24.  Blaylock admitted,
however, that this grievance was resolved in his favor and that
he received the pay sought several weeks after Grievance 4120 was
filed.  See id. at 11-15; Joint Exhibit 3.

        Blaylock also filed Grievance No. 4121 because "he got
bumped out of a day's work".  Blaylock Depo. (Vol. I), at 15-21;
Joint Exhibit 3.  Blaylock essentially admitted that grievance
concerned confusion regarding the rules for drivers "bumping"
other drivers.  See id. at 20-21.  Blaylock testified that he
accepted the resolution of this grievance.  See id. at 18.

        In Grievance No. 4122, Blaylock sought holiday pay that
he felt he was owed.  See id. at 22-23; Joint Exhibit 3.  After a
grievance hearing, on February 3, 2011, Blaylock learned that he
did not have enough hours to meet the threshold for holiday pay.
See id. at 23.  Accordingly, even though the grievance was not
resolved in his favor, Blaylock accepted the final decision.  See
id. at 23.

In his deposition, Blaylock listed several other complaints for which he did not file a grievance under the Labor Agreement that he alleges supports his claim for relief.  On one occasion, Blaylock claims that Schau accused him of stealing time and refused to allow him to drive a package car for the rest of the week.  <u>See</u> Blaylock Depo. (Vol. I), at 41-42; Blaylock Depo. (Vol. II), at 86-89.  Blaylock admitted however, that he was allowed to drive.  <u>See</u> Blaylock Depo. (Vol. I), at 41-42; Blaylock Depo. (Vol. II), at 88-89.  Blaylock also admitted that he was not disciplined by UPS for this alleged incident and that he never filed a grievance over it.  <u>See</u> Blaylock Depo. (Vol. I), at 46-47.

On another occasion, Blaylock claims that a coworker on his truck threatened a physical confrontation and he was forced to leave the coworker at a stop and have a UPS supervisor come and pick him up.  <u>See</u> Blaylock Depo. (Vol. I), at 42-45; Blaylock

---

Blaylock also filed Grievance No. 8404 on March 16, 2011, complaining that he "was laid off while [a] part-time employee worked ahead of me."  Joint Exhibit 3.  The Grievance Form indicates that UPS offered to train Blaylock and pay him 4 hours. <u>See</u> <u>id.</u>

Grievance 8392 was filed by Blaylock on April 27, 2011, alleging that he was reprimanded for not letting Mike Sharpe know on April 25, 2011, that he was working.  According to the grievance, Sharpe indicated that Blaylock told him he would be taking time off for his father's death but Blaylock insisted that conversation never happened.  Joint Exhibit 3.  The Grievance Form indicates that it was held open on June 2, 2011, because Blaylock was not in attendance.  <u>See</u> <u>id.</u>

Depo. (Vol. II), at 101-03.  After the employee continued to make threats about allegedly physically harming Blaylock, Blaylock notified Sharpe but he claims that Sharpe took no action.  See Blaylock Depo. (Vol. I), at 44; Blaylock Depo. (Vol. II), at 104. Blaylock admitted however, that the employee was later discharged, unrelated to the incident with him.  See Blaylock Depo. (Vol. I), at 44-45; Blaylock Depo. (Vol. II), at 31.

Blaylock admits that neither Sharpe nor Schau threatened any physical violence or engaged in any physical violence against him, and that he was never asked to sign or back-date any company forms.  See Blaylock Depo. (Vol. I), at 38, 46, 48. He also admits that no UPS representative has visited his home while sick.  See Blaylock Depo. (Vol. II), at 46.

Despite the largely favorable results on every grievance he filed, Blaylock still complained regarding his representation by the Union.

> Q:  So as we look back on the - - items that we talked about, is it fair - - and correct me if I'm wrong, I'm not trying to stick words in your mouth - - is it fair to say that your complaint is not the resolution of the grievances, but the way they were handled?
>
> A:  For the most part, but I mean, this one I feel was never resolved either.  I mean, like I said, I don't have any problem with - -
>
> Q:  This one being 4027?
>
> A:  Correct.  And I have a problem the way they all are handled?  Yes, sir, I mean, I feel that Johnny just doesn't represent us.

43

```
Q:   But yet the results end up being in your favor.

A:   Well, I mean - - I don't know how - - I don't know when
     or where that happens, I mean - -

Q:   Well, you were - - you were about to be discharged by
     these guys and yet you still have your job today, don't
     you?

A:   I do have my job today, yes, sir.

Q:   So they weren't successful.  UPS was not successful in
     attempting to discharge you.

A:   No, sir.
```

Blaylock Depo. (Vol. I), at 54.

During discovery as to the representation provided by the Union Defendants, Blaylock admitted that his biggest "gripe" was with the handling and resolution of the grievances of Grievance No. 4027.  See id. at 28-31.  As to Austin's service as his union steward, Blaylock testified that Austin had done a good job and had represented him fairly.  See Blaylock Depo. (Vol. II), at 18-19.  Blaylock stated that Austin had never discriminated against him nor had he acted in bad faith towards him.  See id. at 19. Blaylock admitted that he does not have any complaints regarding the Union or Ken Hall specifically, and that his complaints with the Union rest solely on Sawyer's representation.  See id. at 24-25.

According to Blaylock, Sawyer did not return his calls, although other Union representatives returned his call.  See Blaylock Depo. (Vol. I), at 61-63.  Blaylock claims that Sawyer

44

did not speak up for Blaylock during a grievance hearing on Grievance No. 4120.  See id. at 23-24; Blaylock Depo. (Vol. II), at 21-22.  Blaylock believes Sawyer allows Schau to take over grievance meetings.  See Blaylock Depo. (Vol. II), at 21. Blaylock admitted, however, that Sawyer has never prevented him from filing a grievance.  See Blaylock Depo. (Vol. II), at 77-78.

At one point Blaylock testified that Johnny Sawyer never told him not to file a grievance except for the time where he was overpaid by UPS.  See Blaylock Depo. (Vol. I), at 54-55. However, three days later during his second day of deposition testimony, Blaylock stated that Sawyer asked him not to file a grievance on "a few occasions."  Blaylock Depo. (Vol. II), at 23. Blaylock admitted, however, that Sawyer did not prevent him from filing a grievance.  See id. at 23.

> Q:   And did Mr. Sawyers ever - - or Sawyer ever prevent you
>      from physically writing a - -
>
> A:   He asked me not [to] on a few occasions.
>
> Q:   But you went ahead and filed them?
>
> A:   No sir, a couple times I didn't.
>
> Q:   But that was a decision after talking to Mr. Sawyer?
>
> A:   After Mr. Sawyer, the decision was made.

Blaylock Depo. (Vol. II), at 23.

Blaylock further testified:

> Q:   You had indicated that on a couple of occasions Johnny
>      Sawyer had asked you not to file a grievance.  Why
>      don't you tell me about those two things?

45

A:   . . . All I can tell you honestly right now coming to
     head is him telling other employees not to file
     grievances.

Q:   And you phrased it the same, he asked you not to.  He
     never said do not file a grievance or you can't file a
     grievance, did he?

A:   To me personally?

Q:   Yeah.

A:   No, but he has other employees.

Blaylock Depo. (Vol. II), at 77.

## II.  Summary Judgment Standard

Rule 56 of the Federal Rules of Civil Procedure provides:

> The judgment sought shall be rendered
> forthwith if the pleadings, depositions,
> answers to interrogatories, and admissions on
> file, together with the affidavits, if any,
> show that there is no genuine issue as to any
> material fact and that the moving party is
> entitled to a judgment as a matter of law.

The moving party has the burden of establishing that
there is no genuine issue as to any material fact.  Celotex Corp.
v. Catrett, 477 U.S. 317, 323 (1986).  This burden can be met by
showing that the nonmoving party has failed to prove an essential
element of the nonmoving party's case for which the nonmoving
party will bear the burden of proof at trial.  Id. at 322.  If
the moving party meets this burden, according to the United
States Supreme Court, "there can be 'no genuine issue as to any
material fact,' since a complete failure of proof concerning an

46

essential element of the nonmoving party's case necessarily renders all other facts immaterial." Id. at 323.

Once the moving party has met this burden, the burden shifts to the nonmoving party to produce sufficient evidence for a jury to return a verdict for that party.

> The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff. The judge's inquiry, therefore, unavoidably asks whether reasonable jurors could find, by a preponderance of the evidence, that the plaintiff is entitled to a verdict . . . .

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986).  "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Id. at 250-51.

### III.  Analysis

In their motions for summary judgment, defendants argue that plaintiffs' claims are preempted by Section 301 of the Labor Management Relations Act ("LMRA") and that any claims under that statute must fail because plaintiffs cannot show that Local 175 breached its duty of fair representation.  The court agrees.

*A. The Plaintiffs' Claims Are Preempted By Section 301.*

In its Memorandum of Law in Opposition to Defendants' Motions for Summary Judgment, plaintiffs concede that the relationship between UPS and the plaintiffs, as employees of UPS, is governed by the collective bargaining agreement.  See Plaintiffs' Memo at 1-5.  Accordingly, plaintiffs' claims are

47

preempted by Section 301 of the Labor Management Relations Act ("LMRA") which provides as follows: "Suits for violation of contracts between an employer and a labor organization representing employees . . . may be brought in any district court of the United States having jurisdiction of the parties . . . ." 29 U.S.C. § 185(a).

Beyond merely conferring jurisdiction, Section 301 vests federal courts with a duty to develop "a federal common law of labor rights." Davis v. Bell Atlantic-West Virginia, Inc., 110 F.3d 245, 247 (4th Cir. 1997); see also Allis-Chalmers Corp. v. Lueck, 471 U.S. 202, 209 (1985). Following this obligation, the federal courts have repeatedly held that Section 301 completely displaces "any state cause of action 'for violation of contracts between an employer and a labor organization.'" Davis, 110 F.3d at 247 (quoting Franchise Tax Bd. v. Constr. Laborers Vacation Trust, 463 U.S. 1, 23 (1983)). Thus, whenever resolution of a state tort claim "is inextricably intertwined with consideration of the terms of the labor contract," Allis-Chalmers Corp. v. Lueck, 471 U.S. 202, 213 (1985), or alternatively, when the adjudication of a state tort claim "requires the interpretation of a collective bargaining agreement," Lingle v. Norge Div. of Magic Chef, Inc., 486 U.S. 399, 413 (1988), Section 301 mandates preemption of the claim. Davis, 110 F.3d at 247-48; see also McCormick v. AT&T Technologies, Inc., 934 F.2d 531, 536 (4th Cir.

48

1991) ("State tort claims are preempted where reference to a collective bargaining agreement is necessary to determine whether a 'duty of care' exists or to define 'the nature and scope of that duty . . . .'").

In the instant case, plaintiffs' claims encompass a wide range of employee grievances which require interpretation of the terms of the Labor Agreement and are, therefore, preempted by Section 301.  As the Fourth Circuit observed in <u>McCormick</u>: "There are few workplace quarrels that could not be framed as some form of tortious conduct.  Our holding that McCormick's state law claims are preempted by § 301 protects the continued vitality of grievance procedures as a fair and efficient means for the resolution of labor disputes, and it also furthers the uniformity concerns underlying § 301."  934 F.2d at 538.

The Amended Complaint contains allegations of work place harassment, threats, disrespectful conduct, screaming or yelling, utilizing improper language, retaliation, and intimidation by UPS supervisors.  The plaintiffs allege that this was all done "to compel an unreasonable increase in production for Defendant UPS." Amended Complaint, ¶ 10.  The scope of the Labor Agreement is broad -- as set forth in its Article 1, it covers bargaining unit employees (such as the Plaintiffs) "with regard to wages, hours and other conditions of employment."  Joint Exhibit 1, at 2. Further, at Article 37, Section 1(a), the Labor Agreement

49

specifically addresses "Management Employee Relations" and provides in relevant part: "The Employer shall not in any way intimidate, harass, coerce or overly supervise any employee in the performance of his or her duties.  The Employer will treat employees with dignity and respect at all times . . . ."  Id. at 120.  Accordingly, plaintiffs' claims herein -- which involve their rights in the terms and conditions of their employment, including hours worked, and the duty of care of UPS and its employees -- derive from the Labor Agreement.

As well, Article 49 of the Labor Agreement contains extensive procedures for filing grievances, which are defined as "any controversy, complaint, misunderstanding or dispute arising as to interpretation, application or observance of any of the provisions of this Agreement."  Id. at 187-91.  Thus, the claims that the UPS Defendants purportedly "interfered with the rights and abilities of the Plaintiffs . . . to pursue grievances and other means of dispute resolution provided in the [Labor Agreement]" would require interpretation of the Labor Agreement, including the Grievance Procedure of the Labor Agreement.[5]

---

[5] Such conduct would also be a violation of Section 8 of the National Labor Relations Act.  See NLRB v. Eaton Corp., 623 F.2d 479 (6th Cir. 1980) (finding that employer violated § 8 of the NLRA by firing employee for exercising right to file grievances under the collective bargaining agreement); see also Walton v. United States Steel Corp., No. 2:10-cv-188, 2012 WL 6681725, *6 (N.D. Ind. Dec. 21, 2012) ("Claims for retaliation for filing a grievance fall under the National Labor Relations Act.").

Likewise, plaintiffs' claims concerning alleged threats to discharge them or the alleged coercion of an employee while on sick leave to return to work are covered by the Labor Agreement. In Article 50, the Labor Agreement has detailed provisions regarding the discharge of employees. <u>See</u> Joint Exhibit 1, at 192-93. The Labor Agreement also has detailed Sick Leave provisions in Article 68. <u>See</u> <u>id.</u> at 259-60. Furthermore, relevant to certain of Blaylock's claims herein, Article 14, Section 1, provides as follows: "The Employer or its designee shall not visit an injured worker at his/her home, without his/her consent" <u>Id.</u> at 33. Resort to the Labor Agreement would be necessary in resolving these claims which are, therefore, preempted by Section 301 of the LMRA.

The allegations of Austin and Booth, <u>see</u> Amended Complaint at ¶ 11, of purported chest bumps by Sharpe as constituting "threats, intimidation, and coercion" are cast in terms of the language in Article 37, Section 1 of the Labor Agreement regarding the responsibility of UPS and its agents: "The Employer shall not in any way intimidate, harass, coerce . . . . " <u>Id.</u> at 120. These Plaintiffs allege that the chest bumping interfered with their rights under the Labor Agreement. <u>See</u> Amended Complaint, ¶ 11. Thus, by their own admission, the Claims of Austin and Booth are covered by the Labor Agreement and, therefore, are preempted by Section 301.

51

Additionally, by his own actions, Austin acknowledges that his claim of a chest bump arises under, and requires interpretation of, the Labor Agreement.  Austin filed Grievance No. 3337 on May 7, 2009 and, according to him, that grievance's mention of "harassment" was meant to include the alleged chest bumping incident with Sharpe.  While Booth chose not to file a grievance regarding his claim of a chest bump by Sharpe, he testified that he chose not to do so because it purportedly took too long to process grievances -- not because he considered the matter to be outside the scope of the Labor Agreement.  As to Samosky, who complains about a computer monitor being lifted by Sharpe, Samosky admitted at his deposition that he intended to file a grievance but claims that he was deterred from doing so by Schau.  Samosky also admitted that Austin also instructed him to file a grievance which he failed to do.

In sum, the court's resolution of plaintiffs' claims requires the interpretation of the Labor Agreement and, therefore, they are preempted by Section 301.

### 1.   Reliance on UPS' Workplace Violence Policy and UPS's Business Code of Conduct

Plaintiffs argue, for the first time in their response in opposition to defendants' motions for summary judgment, that their claims regarding alleged workplace violence are not preempted by Section 301 because they have a separate remedy pursuant to UPS' Workplace Violence Policy and UPS's Business

52

Code of Conduct (collectively "UPS Policies").  Plaintiffs'
Amended Complaint does not even mention the UPS Policies nor does
it assert any claim based on a breach of an implied-in-fact
contract.  Accordingly, plaintiffs' attempt to insert new
theories in the case at this juncture is improper.  "It is well-
settled that a plaintiff may not expand its claims to assert new
theories in response to summary judgment or on appeal."  Renner
v. Ford Motor Co., No. 12-3656, 2013 WL 765196, *4 (6th Cir. Feb.
28, 2013) (citing Bridgeport Music, Inc. v. WB Music Corp., 508
F.3d 394, 400 (6th Cir. 2007)).  As the United States Court of
Appeals for the Fourth Circuit has explained:

> As we previously stated, notice pleading is
> designed to provide defendants with fair notice
> of the plaintiffs' claims and the grounds upon
> which those claims rest.  Conley, 355 U.S. at 47,
> 78 S. Ct. 99.  Thus, Barclay White's complaint
> cannot be construed so liberally so as to deprive
> Battelle of notice.  Additionally, despite the
> liberal pleading rules outlined by the Supreme
> Court, plaintiffs may not raise new claims
> without amending their complaints after discovery
> has begun.  In Gilmour v. Gates, McDonald & Co.,
> 382 F.3d 1312, 1315 (11th Cir.2004) (citing
> Shanahan v. City of Chicago, 82 F.3d 776, 781
> (7th Cir.1996)), the Eleventh Circuit held that

> > Efficiency and judicial economy require
> > that the liberal pleading standards
> > under Swierkiewicz and Rule 8(a) are
> > inapplicable after discovery has
> > commenced.  At the summary judgment
> > stage, the proper procedure for
> > plaintiffs to assert a new claim is to
> > amend the complaint in accordance with
> > Fed.R.Civ.P. 15(a).  A plaintiff may
> > not amend her complaint through

argument in a brief opposing summary
judgment.

Other circuits have taken similar positions.  <u>See</u>
<u>Tucker v. Union of Needletrades, Indus., &</u>
<u>Textile Employees</u>, 407 F.3d 784, 788 (6th Cir.
2005); <u>Shanahan</u>, 82 F.3d at 781 (citing <u>Car</u>
<u>Carriers, Inc. v. Ford Motor Co.</u>, 745 F.2d 1101,
1107 (7th Cir. 1984)) ("A plaintiff may not amend
his complaint through arguments in his brief in
opposition to a motion for summary judgment.");
<u>Fisher v. Metro. Life Ins. Co.</u>, 895 F.2d 1073,
1078 (5th Cir. 1990) ("As the district court
correctly noted, this claim was not raised in
Fisher's second amended complaint but, rather,
was raised in his response to the defendants'
motions for summary judgment and, as such, was
not properly before the court.").  Barclay White
is, therefore, unable to raise new claims after
discovery has commenced without further amending
its complaint.

<u>Barclay White Skanska, Inc. v. Battelle Mem'l Inst.</u>, 262 Fed.

Appx. 556, 563, 2008 WL 238562, *6 (4th Cir. Jan. 29, 2008); <u>see</u>

<u>also</u> <u>Wahi v. Charleston Area Med. Ctr., Inc.</u>, 562 F.3d 599, 617

(4th Cir. 2009) ("We have previously held, along with the Fifth,

Sixth, Seventh, and Eleventh Circuits, that a plaintiff may not

raise new claims after discovery has begun without amending his

complaint.").

However, even if plaintiffs were not procedurally barred

from advancing their claims based upon the UPS Policies, those

claims would still fail.  First, plaintiffs' implied contract

claim is "inextricably intertwined" with consideration of the

terms of the CBA and, therefore, preempted by the LMRA.  <u>See</u>

<u>Cumpston v. Dyncorp Tech. Services, Inc.</u>, 76 Fed. Appx. 861, 863-

64, 2003 WL 21921919, *3-4 (10th Cir. Aug. 13, 2003) (holding implied contract claim based upon employer's business-ethics standards forbidding harassment of any nature to be preempted by LMRA because consideration of the collective bargaining agreement would be necessary to assess the merits of claim based on breach of implied contract); Galway v. Smith's Food and Drug Center, Inc., 72 F.3d 137, 1995 WL 734423, *2 (10th Cir. 1995) ("A determination that Smith's breached the terms of a contract implied in the employee handbook would require interpretation of the employee discharge provisions in the collective bargaining agreement."); Adkins v. US West Comminications, Inc., 181 F. Supp.2d 1189, 1199 (D. Colo. 2001) (finding implied contract claim based upon employer's alleged breach of its Ethics Code was preempted by LMRA because whether employer acted properly "will inevitably require an analysis of what the CBA permitted"). Conceding that the harassment complaints were subject to the CBA, plaintiff Austin testified:

> Q:   Now, the way I have been reading your amended
>      complaint and that of the other plaintiffs is that
>      you seem to be asserting that UPS, Mr. Schau, and
>      Mr. Sharpe have been violating the labor agreement.
>      Would you agree?
>
> A:   Yes.
>
> Q:   And if that's true, what facts do you base that
>      conclusion on?
>
> A:   You mean as far as the - -
>
> Q:   That they violated the labor agreement?

> A:   I mean, <u>there's articles in the contract as far as</u>
> <u>the way that they're supposed to treat us and talk</u>
> <u>to us, they don't, they violate it.</u>

Austin Depo. (Vol. I), at 100 (emphasis added).

Finally, even if plaintiffs could assert their implied-in-fact contract theory based upon the UPS Policies at this late juncture and it was not preempted by the LMRA, that theory still fails.  Plaintiffs rely upon <u>Cook v. Heck's, Inc.</u>, 342 S.E.2d 453 (W. Va. 1986), to argue that the UPS Policies are implied contracts.  In <u>Cook</u>, the West Virginia Supreme Court of Appeals held that an employee handbook could modify an existing employment at will relationship and vest in the employee contractual rights to job security.  342 S.E.2d 453 (W. Va. 1986).  Finding that the employee handbook constituted an offer of a unilateral contract containing a definite promise by the employer not to discharge the employee except for cause, the court in <u>Cook</u> found that "[t]he inclusion in the handbook of specified discipline for violations of particular rules accompanied by a statement that the disciplinary rules constitute a complete list is prima facie evidence of an offer for a unilateral contract of employment modifying the right of the employer to discharge without cause."  <u>Cook</u>, 342 S.E.2d at 459. In order for a plaintiff to show an implied contract existed, the "claim must be established by clear and convincing evidence."

Reed v. Sears, Roebuck & Company, Inc., 426 S.E.2d 539 (W. Va. 1992) (internal citations and quotations omitted).

The holding in Cook does little to advance plaintiffs' position.  Cook dealt with an exception to the employment-at-will doctrine, which is not even the issue in the case herein.  Even assuming that the holding of Cook could somehow be extended to the facts of this case to conclude that any "promise" in an employee handbook or policy is an implied contract, it is clear that the UPS Policies relied upon by plaintiffs do not contain the sort of "definite promise by the employer" that provides "specific treatment in specific situations."  Cook, 342 S.E.2d at 458.  Because plaintiffs cannot show the existence of an implied contract by clear and convincing evidence their reliance on the UPS Policies is misplaced.

B.      *Plaintiff's Complaint is a Hybrid Section 301 Claim.*

Plaintiffs filed their claims against UPS, Local 175, and the International Union under Section 301 of the Labor Management Relations Act.  See 29 U.S.C. § 185.  That section gives federal courts jurisdiction over suits to enforce the terms of collective bargaining agreements.  Id.  Plaintiffs' claims are a so-called "hybrid 301" action because they have sued Local 175 for breaching its duty of fair representation and UPS for breaching the collective bargaining agreement.  In a hybrid action, in order to prevail on the merits against either party, a plaintiff

57

must prove both 1) that the union breached its duty of fair representation and 2) that his employer violated the collective bargaining agreement.  Thompson v. Aluminum Co. of America, 276 F.3d 651, 656 (4th Cir. 2002).  These two parts of plaintiffs' claim are "inextricably interdependent" and plaintiffs must establish both parts of their hybrid claim in order to prevail. McLeod v. Arrow Marine Transp., Inc., 258 F.3d 608, 613 (7th Cir. 2001) (citing DelCostello v. Int'l Bhd. of Teamsters, 462 U.S. 151, 164-65 (1983)).  "Accordingly, an employee must prevail upon his unfair representation claim before he may even litigate the merits of his § 301 claim against the employer."  Thompson v. Aluminum Co. of America, 276 F.3d 651, 656-57 (4th Cir. 2002)(internal quotation marks omitted).[6]

     "Because the union's breach of its duty of fair representation is an `indispensable predicate' to recovery against the employer, the court should first determine whether there is sufficient evidence to support the claim against the

---

     [6] The statute of limitations for a claim that (1) an employer breached its obligations under the CBA and that (2) a union violated its duty of fair representation is six months. Del Costello v. International Brotherhood of Teamsters, 462 U.S. 151, 172 (1983).  A cause of action accrues when plaintiff "knows or should have known through an exercise of reasonable diligence of the acts constituting the alleged violation."  Wise v. Dallas & Mavis Forwarding Co., 753 F. Supp. 601, 605 (W.D.N.C. 1991); see also Gilfillan v. Celanese Aq, 24 Fed. Appx. 165, 167 (4th Cir. 2001).  A number of plaintiffs' claims are clearly barred by the statute of limitations.

union.  <u>Pipes v. United Parcel Service, Inc.</u>, Civil Action No.
3:07-CV-1762, 2009 WL 1684689, *4 (W.D. La. Jun. 16, 2009)
(quoting <u>Landry v The Cooper/T. Smith Stevedoring Co., Inc.</u>, 880
F.2d 846, 851 (5th Cir. 1989)).  Accordingly, the court will turn
to plaintiffs' claim against Local 175.

C.      *Local 175 Did Not Breach Its Duty of Fair Representation.*

        In <u>Smith v. United Steel Workers of America</u>, Civil Action
No. 2:04-0499, 2007 WL 2477345 (S.D.W. Va. Aug. 29, 2007), Judge
Copenhaver articulately stated the legal standards governing a
court's determination as to whether a union has breached its duty
of fair representation:

>        In assessing whether the duty of fair
> representation has been breached, union judgments
> are afforded great deference.  <u>Air Line Pilots
> Ass'n, Intern. v. O'Neill</u>, 499 U.S. 65, 78
> (1991).
>
>        Congress did not intend judicial review
> of a union's performance to permit the
> court to substitute its own view of the
> proper bargain for that reached by the
> union.  Rather, Congress envisioned the
> relationship between the courts and
> labor unions as similar to that between
> the courts and the legislature.  Any
> substantive examination of a union's
> performance, therefore, must be highly
> deferential, recognizing the wide
> latitude that negotiators need for the
> effective performance of their
> bargaining responsibilities.
>
> <u>Id.</u>
>
> A union breaches its duty of fair representation
> when its "conduct toward a member of the
> collective bargaining unit is arbitrary,

discriminatory, or in bad faith." <u>Vaca v. Sipes</u>,
386 U.S. 171, 190 (1967).  Whether a union acted
arbitrarily, discriminatorily or in bad faith
requires a separate analysis, because each of
these . . . [prongs] represents a distinct and
separate obligation."  <u>Thompson v. Aluminum Co.
of America</u>, 276 F.3d 651, 657 (4th Cir.
2002)(citing <u>Griffin v. Int'l Union</u>, 469 F.2d
181, 183 (4th Cir. 1972)).  In fact, "[w]hile the
analysis of whether a union's actions were
arbitrary looks to the objective adequacy of that
union's conduct, the analysis of [the]
discrimination and bad faith [prongs] must focus
on the subjective motivation of the union
officials."  <u>Thompson</u>, 276 F.3d at 658 (citing
Crider, 130 F.3d at 1243).

<u>Smith</u>, 2007 WL 2477345, at *8-9.

In this case, the record is devoid of any evidence that

Local 175 or its agent, Johnny Sawyer, acted with any sort of

discriminatory or bad faith animus towards plaintiffs.  The court

thus focuses primarily on the arbitrary prong of the calculus

which is also the focus of Plaintiffs' Memorandum in Opposition

to the Defendants' Motions for Summary Judgment.  <u>See</u> Plaintiffs'

Memo. at 31-38.

To be arbitrary, "a union's conduct towards its member

must be so far outside a wide range of reasonableness that it is

wholly irrational." <u>Thompson v. Aluminum Co. of America</u>, 276

F.3d 651, 657 (4th Cir. 2002).  A court can find a union's

actions arbitrary for purposes of a breach of the duty of fair

representation "only if, in light of the factual and legal

landscape at the time of the union's actions, the union's

behavior is so far outside a wide range of reasonableness as to

60

be irrational." <u>Airline Pilots Ass'n v. O'Neill</u>, 499 U.S. 65, 67 (1991) (internal citations and quotations omitted). Neither simple negligence nor a mistake in judgment is a breach of the union's statutory duty.[7] Furthermore, "a union is accorded considerable discretion in the handling and settling of grievances." <u>Griffin v. International Union U.A.W.</u>, 469 F.2d 181, 183 (4th Cir. 1972). "[A]ny deficiencies in the union's choice of tactics do not rise to the level of a breach of [the] duty of fair representation." <u>Walden v. Local 71, International Brotherhood of Teamsters</u>, 468 F.2d 196, 197 (4th Cir. 1972).

Plaintiffs complain about the way Local 175 investigated and prosecuted the merits of their grievances. Specifically, they complain that Sawyer did not meet with them prior to the date of their grievance hearing and that he often talked to UPS

---

[7] Several of plaintiffs' claims would compel a finding that Local 175 was negligent at best. For example, plaintiffs make much ado regarding the processing of Austin's Grievance No. 3337 which, according to him, included the allegations regarding the chest bump he received from Sharpe. According to Austin, this part of the grievance has not been resolved. However, Sawyer testified that he thought the grievance had been resolved in its entirety and did not know that it included a claim of workplace battery. The grievance merely read: "excessive number of rides, harassed, eat, safety issues." Sawyer's interpretation regarding the scope of the grievance was negligent at best.

Likewise, Neely's complaints regarding the handling of Grievance No. 4035 which Sawyer says he never received would, at most, amount to negligence. <u>See</u> <u>Zuniga v. United Can Co.</u>, 812 F.2d 443, 451 (9th Cir. 1987) (concluding that loss of records relating to union member's grievance during merger of his local into another local was merely negligent).

management before talking to the aggrieved employee or sometimes talked to UPS management outside the presence of the aggrieved employee.  Plaintiffs also contend that the Local Union held a grievance hearing on one of Booth's grievances without Booth being present.  <u>See</u> Plaintiffs' Memo at 33-34.  Plaintiffs also seem to take exception to Sawyer's filing system.  <u>See</u> <u>id.</u> at 34.

First, to extent that plaintiffs seem to suggest they should be able to dictate the manner and method in which Local 175 processes their grievances, that contention is clearly without merit.  "A union is its members' representative, not their puppet, and its duty of fair representation is not a servitude to their individual whims."  <u>Amburgey v. Consolidation Coal Co.</u>, 923 F.2d 27, 30 (4th Cir. 1991).  Accordingly, claims that Sawyer was talking to UPS supervisors outside the employee's presence or prior to talking to the employee will not establish a breach of the union's duty of fair representation; <u>Harrigan v. Caneel Bay, Inc.</u>, 745 F. Supp. 1122, 1128-29 (D. Vi. 1990) ("A union need not inform the employee of his or her grievance's progress or notify the employee that the organization's own effort toward a private resolution of the dispute has ended.").  Likewise, even if the Local Union could have kept the grievants better informed during the process, that alone does not establish a breach of the union's duty.  <u>Renner v. Ford Motor Co.</u>, No. 12-3656, 2013 WL 765196, *4 (6th Cir. Feb. 28, 2013) ("While the

[Union] could have kept Plaintiff better informed during the grievance process, it is well-accepted that a union does not breach the duty of fair representation merely by failing to consult with an employee before settling his grievance."); see also Smith, 2007 WL 2477345, at *11 ("[A] union's failure to keep a grievant informed of the status of the grievance is not, standing alone, a breach of the duty of fair representation.").

Likewise, Booth's complaint regarding his absence at a grievance hearing for one of his grievances does not rise to the level of a breach of the union's duty of fair representation. See Renner, 2013 WL 765196, at *4 ("[A] union does not violate its duty merely by failing to consult with an employee before settling his grievance."). Furthermore, a union's decision not to take further action on an employee grievance that it deems meritless will not violate the duty of fair representation, provided it makes that determination in good faith. See id.

Plaintiffs also complain regarding the delay in the processing of their grievances and Local 175's failure to adhere to the deadlines established by the CBA. As the Smith court explained, however, mere delay is not sufficient to establish a breach of the union's duty:

> While not ideal, the six and a half month period between step three and step four and the approximately three to six months that elapsed between the step four decision and the defendant's refusal to speak with the USWA do not rise to the level of wholly irrational,

63

perfunctory, or otherwise arbitrary conduct
necessary for a successful breach of the duty of
fair representation claim.  See Vaca, 386 U.S. at
190-92.  "Malicious or egregious delay in
pursuing plaintiff's rights can violate the Vaca
proscription." Walker v. Consolidated
Freightways, Inc., 930 F.2d 376, 382 (4th Cir.
1991).  However, there are no allegations by the
plaintiff here that the delay was malicious.
Though Walker did not elaborate further on what
constitutes an "egregious delay," at least one
district court has found that a two-year delay
between the fourth step of the grievance and the
withdrawal of the grievance was "not per se
unreasonable" when plaintiff had "submitted no
proof that the Union typically processes other
grievances faster than his, or that the Union
acted with bad faith." Armstrong v. Chrysler
Corp., 972 F.Supp. 1085, 1090 (E.D. Mich. 1997).

The district court in Armstrong added,
"[m]oreover, nothing suggests that the passage of
time affected the ultimate disposition of
plaintiff's grievance." Id.  Two circuit courts
of appeal have similarly found that a plaintiff
must establish that the plaintiff was harmed by
the union's arbitrary conduct.  Garcia v. Zenith
Electronics Corp., 58 F.3d 1171, 1176 (7th Cir.
1995); Black v. Ryder, 15 F.3d 573, 585 (6th Cir.
1994); Ryan v. General Motors Corp., 929 F.2d
1105, 1109 (6th Cir. 1989). In Ryan, a two-year
delay in the union notifying the member of the
withdrawal of his grievance was not a breach of
the duty because no prejudice resulted.  Ryan,
929 F.2d at 1109.

Smith, 2007 WL 2477345, at *10; see also Aaron v. Ford Motor Co.,

479 Fed. Appx. 670, 672, 2012 WL 1522900, *2 (6th Cir. 2012)

(holding that, even though grievance process of twenty months was

"not speedy," union did not breach duty of fair representation).

As in Smith, while the delay herein may not have been

"ideal," it does not "rise to the level of wholly irrational,

perfunctory, or otherwise arbitrary conduct" necessary to establish a breach of the union's duty of fair representation. The Local Union explained its reasons regarding the waiver of the deadlines in the CBA and noted that it was common practice across multiple local unions to let grievances accumulate so that both management and union officials could work through multiple grievances efficiently.  See Hall Decl. at ¶ 9.  Such conduct does not rise to the level of arbitrariness needed to establish an unfair representation claim.  See Smith v. Drug, Chemical, Cosmetic, Plastics and Affiliated Indus. Warehouse Employees Local 815, 943 F. Supp. 224, 239 (E.D.N.Y. 1996) (finding no breach of union's duty of fair representation where "[c]onsistent with the parties' practice of some twenty-five years" neither employer nor union "held the other to the formal notification provisions of. . . the CBA" because "the union had an articulable basis for processing grievances in the manner in which they did, thereby taking their actions out of the realm of arbitrariness").

     In any event, plaintiffs have not shown that any delay in the processing of grievances "tainted the grievance procedure such that the outcome was more than likely affected by the Union's breach."  Dushaw v. Roadway Express, Inc., 66 F.3d 129, 132 (6th Cir. 1995).

     As a final matter, the court acknowledges that plaintiffs' frustration with the grievance procedure might on a

few occasions be justified.  However, the record shows that
plaintiffs never filed grievances for a majority of the conduct
of which they complain.  Indeed, their failure to do so has made
the court's task in judging the union's conduct more difficult
herein.  In any event,

> [w]hen all is said and done, however, the court
> is compelled to observe that while plaintiff[s']
> frustration with the grievance/arbitration
> process here is understandable and perhaps, in
> some instances, even justifiable, that simply is
> not a sufficient basis for seeking federal court
> intervention. . . .
>
>     Plaintiff[s] seem[ ] to be ignoring the
> realities of the circumstances under which these
> defendants must operate.  The Union's membership
> is vast requiring it to, among other things,
> prioritize grievances for purposes [of]
> proceeding through grievance/arbitration.  While
> certainly it would be desirable from
> plaintiff[s'] standpoint, as well as from the
> standpoint of all Union members with grievances,
> if the Union and [employer] could quickly respond
> to their grievances and do so in a manner
> favorable to them, that would be impossible – no
> matter how diligent and conscientious the
> defendants were.  The grievance/arbitration
> procedure is, by its very nature, a system of
> compromises, not unlike the legal system; thus at
> any given time any participant in that process is
> bound to be dissatisfied.

Yakowec v. Niagra Mohawk Power Corp., No. 92-CV-1130, 1993 WL
226435, *18 (N.D.N.Y. Jun. 24, 1993).

Because plaintiffs have "failed to present evidence from
which a reasonable fact finder could conclude that the union's
actions were wholly irrational, perfunctory, or otherwise
arbitrary," defendants are entitled to summary judgment on the

duty of fair representation claim.  Smith v. United Steel Workers of America, Civil Action No. 2:04-0499, 2007 WL 2477345, *12 (S.D.W. Va. Aug. 29, 2007).

Furthermore, plaintiffs cannot establish their Section 301 claim against the UPS defendants for breach of the Labor Agreement without also establishing that the Local Union breached its duty of fair representation.  Having found no genuine issue of material fact to support plaintiffs' claim against Local 175, the UPS defendants are entitled to the entry of judgment in their favor on the Section 301 claim.

D.      *Plaintiffs Are Not Excused From Exhaustion*

"Generally, an employee must exhaust the CBA's grievance procedures before pursuing judicial remedies; however, an employee may be excused from doing so if: (1) resorting to the grievance procedure would be futile; (2) the employer through its conduct repudiated the grievance procedure itself; or (3) the union breached its duty of fair representation."  McLeod v. Arrow Marine Transp., Inc., 258 F.3d 608, 616 (7th Cir. 2001); see also Vaca v. Sipes, 386 U.S. 171, 185 (1967) ("An obvious situation in which the employee should not be limited to the exclusive remedial procedures established by the contract occurs when the conduct of the employer amounts to a repudiation of those contractual procedures.").

In an attempt to get around their failure to file grievances on a number of their claims and instead seek redress in this forum, plaintiffs contend that they are excused from doing so because (1) any effort to do so would be futile; (2) UPS repudiated the grievance procedure; and (3) the union breached its duty of fair representation. Having already concluded that Local 175 did not breach its duty of fair representation, the court considers whether plaintiffs have shown that either the futility or repudiation exception should apply.

A plaintiff must make a clear and positive showing of futility. Cox v. Essex Group, Inc., 838 F. Supp. 1443, 1446 (D. Kan. 1993). "[A]n employee's speculation that it would be futile to file a grievance is insufficient to excuse the employee's failure to exhaust. . . . Rather, the employee must put the grievance procedure to the test, . . . for example, by filing repeated complaints to company and union officials." Perry v. Midstates Independent Union, 20 Fed. Appx. 527, 531, 2001 WL 1173238 (7th Cir. 2001) (internal citations and quotations omitted); see also Liles v. Washington Tru Solutions, LLC, 303 Fed. Appx. 576, 578, 2008 WL 4999067, *3 (10th Cir. 2008) (no showing of futility where employees did not file grievance because "their coworkers told them not to bother trying to file grievances because the union would not process them"); Parham v. Carrier Corp., 9 F.3d 383, 390-91 (5th Cir. 1993) ("Although a

68

disgruntled employee may bring a suit without first exhausting available grievance procedures if exhaustion of those remedies would be futile, such an employee may not simply assert that his use of grievance procedures would have been futile: he must ordinarily at least have attempted to use them."); Fizer v. Safeway Stores, Inc., 586 F.2d 182, 184 (10th Cir. 1978) (futility not shown where employee "never actually filed charges . . . and therefore never gave the system a chance to work").

In the instant case, plaintiffs cannot meet their heavy burden of showing that use of the grievance procedure would have been futile because, in most instances, they did not even attempt to invoke the process.  As the Parham court noted, "[t]he futility exception requires exactly that – futility."  Parham at 391.  The record does not show any impediment to the plaintiffs filing grievances.  As Hall testified, "the grievance process is initiated by the filing of a written grievance.  Those complaints are dealt with initially at the local level by the shop steward appointed or elected from the local union members at a particular facility.  Typically, the shop steward meets with the local supervisor."  Hall Decl. ¶ 7.  There is no evidence that plaintiff Austin, as the Shop Steward, refused to file a grievance on behalf of any of the plaintiffs.  Based on the foregoing, plaintiffs cannot claim that the grievance process was futile given their failure to avail themselves of it.  See Ryberg

v. Indoor Soccer Club of Cleveland, 972 F.2d 348, 1992 WL 181944,
*3 (6th Cir. 1992) ("The situation being such that plaintiffs did
not even attempt to begin the arbitration process on their own,
plaintiffs cannot now be heard to argue that arbitration was
rendered futile by defendants.") (unpublished).

     Plaintiffs fare no better in invoking the repudiation
exception to exhaustion.  In support of their repudiation
argument, plaintiffs point to Schau telling Samosky that the
chest bump incident was a private matter and not a union matter
and alleged threats to employees who attempted to file
grievances.  According to plaintiffs, this is evidence that the
UPS defendants had repudiated the grievance process.  As to Schau
telling Samosky that the chest bump incident was not a "union
matter," that does not rise to the level of repudiating the
grievance process.  At best, it indicates a disagreement between
Schau and Samosky about whether the incident was covered by the
CBA.  However, "an employee is not excused from using a grievance
procedure just because the employer has stated that it disagrees
with the employee's position.  As the trial judge pointed out,
grievance procedures are supposed to resolve differences between
an employee and an employer."  Vance v. M. Loeb Co., 812 F.2d
1402, 1987 WL 36513, *2 (4th Cir. 1987); see also Smith v.
American Airlines, Inc., 414 F.3d 949, 953 (8th Cir. 2005) ("[I]t
is apparent that AA did not `repudiate' the grievance and

arbitration procedures in the transition collective bargaining agreement.  It simply took the position that they did not apply to this dispute.").  Furthermore, the evidence is clear that Shop Steward Austin told Samosky he should file a grievance and there is no evidence that the Union would not have done so had he requested.  As to Samosky's allegations, there was no grievance for UPS to repudiate.

As to the alleged threats regarding the consequences for filing grievances, courts "will not find repudiation simply because the employer refused to follow one or more of the substantive terms of the CBA; rather [a court] will excuse the requirement for exhaustion based on repudiation only if the employer repudiates the specific grievance procedures provided by the CBA." Sidhu v. Flecto Co., Inc., 279 F.3d 896, 898-99 (9th Cir. 2002) (finding repudiation where employer stated in writing that it would not, and was not willing to, process the employee's grievance).  In this case, there is no evidence that UPS repudiated the grievance process.

E.     *Plaintiffs' Claims Against the International Union Fail*

The court also finds that plaintiffs have failed to demonstrate a plausible claim for breach of a duty of fair representation against the International Union.  Plaintiffs have failed to point to any evidence in the record that the International Union had any responsibility for, or was involved

71

in any way, in the actions complained of herein.  As Ken Hall

explained:

> [L]ocal unions affiliated with the International
> Union, including Local Union 175 are separate,
> autonomous organizations.  Local unions, such as
> Local 175, enter into their own contracts, elect
> their own officers, and engage in business in
> their own name.  They hire, fire, discipline,
> promote, and supervise their own employees.
> Local unions are chartered by the International
> Union but, pursuant to applicable constitutional
> provision, they have constitutional authority
> which they exercise freely to govern themselves
> and to transact business on their own behalf
> through their own agents or representatives.
> Local unions are self-governing, unincorporated
> associations whose officials, agents and
> employees are elected and/or appointed and
> compensated by each local union.  The
> International Union and Local 175 are located in
> different states, do not share equipment or

supplies, have different budgets and bank accounts, have
different on-site staffs and do not aggregate payrolls, tax
accounts or other financial information.  The officers and agents
of affiliated local unions are authorized only to act for and in
behalf of and in the name of their local unions.

Hall Decl. at ¶ 18.

Because of this, plaintiffs could point to no facts to

support their claims against the International Union.  As Greg

Neely testified:

> Q:   Could you tell me what the basis - - what facts you
>      have to support your contention that there is a
>      conspiracy between United Parcel Service and the
>      International Union to prevent people from filing
>      grievances?
>
> A:   For me personally?
>
> Q:   Yes.
>
> A:   For me personally, none that I'm aware of. . . .

> Q:   Just so I am clear, you don't know of any
>       International official that's conspired with the
>       company; is that correct?
>
> A:   No, sir.
>
> * * *
>
> Q:   Are you asserting any injuries that are the result
>       of actions taken by the International Union
>       officials with regard to anything in the complaint?
>
> A:   No, sir.
>
> Q:   Are you asserting any damages that you've suffered
>       as a result of anybody from the International not
>       taking an action you requested them to take?
>
> A:   No, sir.

Neely Depo. (Vol. I), at 177-78, 182-83.  J.C. Blaylock testified

along similar lines:

> Q:   Do you have any facts which support the contention
>       and the complaint that there's a conspiracy between
>       the international and UPS?
>
> A:   I don't, no, sir.
>
> Q:   Do you have any facts to support the allegation and
>       complaint that UPS has prevented the international
>       from processing grievances?
>
> A:   No, sir.
>
> Q:   Any information to support the allegation and the
>       complaint that UPS has prevented the international
>       from filing grievances?
>
> A:   No, sir.

Blaylock Depo. (Vol. I), 70-71.  In addition, the International

Union is not the certified bargaining representative of any UPS

employee.  See Hall Decl. at ¶4.

73

As an alleged basis for liability against the International Union, in their Complaint, plaintiffs contend that "[t]he conduct of the Defendant Local Union to intentionally or recklessly fail to fully and fairly represent one or more of the Plaintiffs and others as alleged herein is imputed to the Defendant National Union since the Defendant Local Union is legally affiliated with the Defendant National Union, and the Defendant Local Union acts on behalf of the Defendant National Union with regard to these matters.  Furthermore, the Defendant National Union has failed and refused to ensure the Defendant Local Union complies with its duties of fair representation and dispute resolution." Amended Complaint ¶ 20.  However, "[t]he mere fact of affiliation does not render the International liable for the acts of the Local." Taylor v. Roadway Express, No. 85-2309-MA, 1986 Wl 1250412, *6 (W.D. Tenn. Aug. 19, 1986).  "The International Union is a separate body from the local.  The acts of the local and its agents cannot automatically be imputed to the International." Shimman v. Frank, 625 F.2d 80, 97 (6th Cir. 1980); see also Gerhardt v. Air Transport Local 557, Civil Action No. H-09-3314, 2011 WL 666500, *9 (S.D. Tex. Feb. 14, 2011)("Common law principles of agency apply to determine whether an international union is liable for the actions of a local affiliate. . . . A principal-agent relationship cannot be inferred merely because the international union is affiliated

with a local union."). Furthermore, plaintiffs cannot rest their claim on the failure of the International Union to take certain steps or more closely monitor the work of Local 175. See Carbon Fuel Co. v. United Mine Workers of America, 444 U.S. 212, 217-18 (1979) ("In the face of Congress' clear statement of the limits of an international union's legal responsibility for the acts of one of its local union, it would be anomalous to hold that an international is nonetheless liable for its failure to take certain steps in response to the actions of the local."); see also Phelan v. United Ass'n of Journeyman of Plumbing Indus. Local 305, 973 F.2d 1050, 1061 (2d Cir. 1992)("An international union has no independent duty to intervene in the affairs of its local chapters even where the international has knowledge of the local's unlawful acts."); Gerhardt v. Air Transport Local 557, Civil Action No. H-09-3314, 2011 WL 666500, *9 (S.D. Tex. Feb. 14, 2011)("Moreover in Carbon Fuel the Supreme Court rejected the argument that the international unions should be liable for its failure to respond to the actions of its local union because such a rule would pierce the shield that Congress took such care to construct.") (internal citations and quotations omitted).

For all these additional reasons, the International Union was entitled to entry of judgment in its favor.

## IV.  Conclusion

For the reasons discussed above, the motion for summary judgment filed by defendant Chauffeurs, Teamsters and Helpers Local Union No. 175 was GRANTED, the motion for summary judgment filed by defendant International Brotherhood of Teamsters, AFL-CIO was GRANTED, and the motion for summary judgment filed by defendants United Parcel Service, Sharpe, and Schau was GRANTED. The Clerk is directed to send copies of this Memorandum Opinion and Order to all counsel of record.

**IT IS SO ORDERED** this 6th day of May, 2013.

ENTER:

David A. Faber
Senior United States District Judge